*This opinion is subject to revision before publication.*

# UNITED STATES COURT OF APPEALS
## FOR THE ARMED FORCES

───────────

## UNITED STATES
Appellee

**v.**

## Nidal M. HASAN, Major
United States Army, Appellant

**No. 21-0193**
Crim. App. No. 20130781

Argued March 28, 2023—September 6, 2023

Military Judges: Gregory A. Gross and Tara A. Osborn

For Appellant: *Major Bryan A. Osterhage* and *Jonathan F. Potter*, Esq. (argued); *Colonel Michael C. Friess*, *Major Christian E. DeLuke*, *Captain Carol K. Rim*, and *Captain Andrew R. Britt* (on brief); *Captain Roman W. Griffith*.

For Appellee: *Major Jennifer A. Sundook* and *Captain Timothy R. Emmons* (argued); *Colonel Christopher B. Burgess*, *Lieutenant Colonel Jacqueline J. DeGaine*, *Captain Anthony J. Scarpati*, and *Captain A. Benjamin Spencer* (on brief); *Lieutenant Colonel Craig J. Schapira*, *Major Dustin L. Morgan*, and *Captain Karey B. Marren*.

Chief Judge OHLSON delivered the opinion of the Court, in which Judge SPARKS, Judge MAGGS, Judge HARDY, and Judge JOHNSON joined.

───────────

Chief Judge OHLSON delivered the opinion of the Court.

## Overview of the Case

In the early afternoon of November 5, 2009, Appellant, an Army psychiatrist, walked into the crowded Soldier Readiness Processing (SRP) center at Fort Hood, Texas.[1] He suddenly opened fire with a semiautomatic handgun equipped with two laser sights, killing thirteen people and wounding thirty-one others.[2] He was only stopped when law enforcement officers confronted him outside the building and shot him. As a result of being shot, Appellant is now paralyzed from the waist down and is permanently confined to a wheelchair.

The evidence adduced at trial indicates that in the months leading up to November 5, Appellant carefully planned and prepared for his attack. In late-July 2009, he visited an off-post gun shop and asked the salesperson, "What is the most technologically advanced handgun on the market?" The salesperson recommended a Fabrique Nationale (FN) 5.7, and he confirmed that this handgun model had a high magazine capacity. The salesperson also informed Appellant of the extensive damage a high velocity bullet fired by the FN 5.7 would cause after impacting the human body. Appellant purchased the recommended weapon, along with magazine extension kits to increase the firing capacity to thirty rounds per magazine. He also purchased laser sights and had them mounted on the weapon. Appellant became a regular customer at the gun store,

---

[1] On May 9, 2023, Fort Hood was renamed Fort Cavazos. *See* Fort Cavazos Redesignation, https://home.army.mil/cavazos/about/fort-cavazos-redesignation (last visited August 17, 2023). However, to maintain consistency with the briefs and case history, we will continue to refer to the site of the attack as Fort Hood.

[2] Appellant shot thirty-one individuals but was charged with thirty-two specifications of attempted premeditated murder because he exchanged gunfire with Officer MT—a civilian police officer—who was not shot during the attack.

returning to buy boxes of ammunition and additional magazines with extension kits.

In October 2009, Appellant began target practice with his FN 5.7 at a local shooting range. He became proficient at hitting targets in the center of mass or in the head at a distance of 100 yards. On one such occasion, Appellant obtained guidance from the firearms instructor on how to practice "speed loading" of the weapon. Also in October, Appellant was informed by his superior that he was selected to deploy to Afghanistan the following month and that he was required to process through the SRP center prior to his deployment. As noted by the United States Army Court of Criminal Appeals (ACCA) in its opinion, "Appellant expressed to a co-worker his reluctance to deploy and stated, 'They've got another thing coming if they think they are going to deploy me.'" *United States v. Hasan*, 80 M.J. 682, 692 (A. Ct. Crim. App. 2020) (en banc).

Appellant visited the SRP center between seven and nine times in the two weeks prior to the attack. A servicemember who witnessed these unscheduled visits to the SRP center testified that they "didn't have a purpose," and he reminded Appellant that he was not supposed to return to the SRP center until the completion of his physical.

In the early afternoon of November 5, 2009, Appellant, concealing his FN 5.7 and nearly 400 rounds of ammunition, entered the SRP center. Numerous soldiers were inside the building. Most of them were either waiting to meet with medical personnel, who were located in cubicles, to see if they were medically cleared to deploy or, for those soldiers returning from deployment, to discuss any medical concerns. Unprompted, Appellant walked up to a civilian data-entry clerk, telling her that she was needed elsewhere. As soon as the clerk departed the area Appellant pulled out his FN 5.7 handgun, yelled "Allahu Akbar!" and began shooting at his fellow soldiers using speed reloading techniques. From his initial position Appellant was able to view the two exits from the building. A witness testified that Appellant was "firing at soldiers running out the front door. He was firing at soldiers running out the back door."

As soldiers tried to take cover in and around the cubicles, Appellant walked across the facility shooting several soldiers in the back as they tried to exit the building. Another witness described the scene:

> I [was] just watching him shoot and at this time the room was filled with gun smoke and I see the weapon that he had, had a green light and a red laser and it's going through the haze and the gunfire just continued to go off. . . . [H]e just kind of just walked back and forth and was just shooting us for what felt like an eternity.

Eventually Appellant left the SRP center to pursue fleeing soldiers. He then tried to enter another building but the door was locked. When law enforcement officers arrived, they located Appellant outside the SRP center building. Appellant refused an order to drop his weapon and a gunfight ensued, resulting in a law enforcement officer being shot multiple times. Appellant stood over the wounded officer and attempted to shoot her again at point-blank range but his weapon malfunctioned. Appellant was then shot in the chest by another law enforcement officer and taken into custody.

On July 6, 2011, the convening authority referred the charges against Appellant to a general court-martial as a capital case. Nearly two years later—and two months before the start of trial—Appellant elected to represent himself during the proceedings. However, standby counsel were present and were prepared to provide assistance if Appellant requested it.

At trial before a panel of officer members sitting as a general court-martial, Appellant made an opening statement in which he immediately acknowledged the following:

> The evidence will clearly show I am the shooter. . . .
>
> . . . .
>
> But the evidence presented during this trial will only show one side. The evidence will show also show [sic] that I was on the wrong side [of]

> America's war on Islam. But then I switched sides,
> and I made mistakes.

Appellant also informed the panel members during his opening statement that he was "an imperfect Muslim[] trying to establish the perfect religion of Almighty God, as supreme on the land despite the disbeliever's hatred for it," and he "apologize[d] for any mistakes [he] made in this endeavor."

Following opening statements the prosecution elicited multiple days of witness testimony on the merits. However, Appellant did not put on a case-in-chief. He also did not make a closing argument. After this trial on the merits, the panel convicted Appellant of thirteen specifications of premeditated murder, and thirty-two specifications of attempted premeditated murder in violation, respectively, of Articles 118 and 80, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 918, 880 (2006).

The sentencing phase of the trial lasted four days. Again, although the Government put on a sentencing case, Appellant rested his case without putting on any witness testimony or making any sentencing argument. The panel sentenced Appellant to death, dismissal from the service, and forfeiture of all pay and allowances.

With regard to the submission of clemency matters, Appellant was initially represented by counsel but he ultimately elected to proceed pro se. Upon consideration of Appellant's submission, the convening authority approved the adjudged sentence.

Appellant has been represented by counsel during his appeals. The lower appellate court—ACCA—affirmed the findings and sentence. *Hasan*, 80 M.J. at 721. That court later denied Appellant's motion for reconsideration. *Hasan v. United States*, No. ARMY 20130781, 2021 CCA LEXIS 114, at *1 (A. Ct. Crim. App. Mar. 15, 2021) (en banc) (order) (unpublished).

Because Appellant's affirmed sentence includes death, his case is now before this Court for mandatory review. Article 67(a)(1), UCMJ, 10 U.S.C. § 867(a)(1) (2012).

Appellant assigns forty-nine issues—eleven briefed and thirty-eight unbriefed—and personally asserts another issue pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982). Via these issues, he is seeking to reverse the findings and sentence in this case or, in some instances, to obtain other relief. However, after carefully considering his raised issues and the record, we conclude that Appellant is not entitled to any relief. We therefore affirm the judgment of the lower court. We now turn to the issues in their presented order.

## Issue I: Whether the Military Judge Erred in Allowing Appellant to Represent Himself Because Appellant's Waiver of Counsel Was Not Voluntary or Knowing and Intelligent

Appellant argues that his waiver of counsel and decision to proceed pro se was involuntary—and therefore invalid under the Sixth Amendment—because he was confronted by a "constitutionally repugnant choice: go to trial with counsel who were diametrically opposed to his fundamental objective or go alone." Brief for Appellant (Final Copy) at 40, *United States v. Hasan*, No. 21-0193 (C.A.A.F. May 5, 2022) [hereinafter Appellant's Brief]. We conclude that the facts and the law do not support Appellant's contention.

### I. Background

When Appellant was arraigned in July 2011, he was represented by three military defense counsel: Lieutenant Colonel (LTC) KP, Major (MAJ) CM, and Captain (CPT) JO. Early in the pretrial stage of his court-martial, Appellant released CPT JO, who was replaced by MAJ JM. This team of counsel represented Appellant through more than twenty pretrial sessions.

As trial approached, however, an apparent divergence of views emerged between the preferred trial strategies of Appellant and his counsel. On May 17, 2013, Appellant's defense team presented him with a memorandum explaining their intended trial strategy. The memorandum stated that the defense team intended to argue that Appellant did

not have a "premeditated design to kill" at the time he committed the shootings. Specifically, Appellant's defense team told him that they intended to show that he had been:

> so affected by religious passion that [he] could not or did not consider the consequences of the act with a cool mind. In other words, [he was] so eager to get right with God, so afraid of the Hellfire for both [himself] and [his] parents, and so convinced that [he] had to do something drastic to please God, that [he] believed [he was] taking the right action.

In other words, counsel wanted to try to demonstrate at trial that Appellant was "so consumed by religious passion that [he] believed that if an act pleased God, there was no real choice about whether to do the act," and thus Appellant lacked premeditation in regard to his offenses.

Instead of agreeing to pursue this "religious passion" theory, Appellant wanted to pursue a strategy that would attempt to establish that his attack on his fellow soldiers was justified. Specifically, he desired to argue that because the war in Afghanistan was illegal, by shooting U.S. soldiers preparing to deploy to that country he was actually acting in the defense of others—that is, protecting members of the Taliban such as its leader, Mullah Omar, from imminent harm at the hands of U.S. soldiers. Appellant and his military defense counsel had previously discussed such a strategy. However, after researching the issue, his counsel advised Appellant that this theory did not constitute a legally viable defense under the facts of the case.

After reviewing the memorandum and enclosures presented to him, Appellant wrote at the bottom of the memorandum, in pertinent part: "Based on these documents as well as discussions with [LTC KP] I deem it necessary to represent my self [sic]." The same day, Appellant filed a notice with the court that he wanted to waive counsel and proceed pro se.

At the next Article 39(a), UCMJ, 10 U.S.C. §839(a) (2012 ed.), session, the military judge engaged in a colloquy

with Appellant to discuss his request. As summarized by
the lower court, the military judge:

> established [A]ppellant had discussed the request
> with his counsel prior to signing it. She then re-
> advised [A]ppellant of his right to counsel, to in-
> clude his right to request individual military
> counsel (IMC)[3] or hire civilian counsel at his own
> expense. Appellant indicated he understood his
> right to counsel and still no longer wished to be
> represented by his three military counsel or any
> other attorney.

*Hasan*, 80 M.J. at 694.

After discussing with Appellant his physical and mental
condition vis-à-vis representing himself, the military judge
ordered the Government to have him medically examined.

At a subsequent session of court, the military judge re-
ceived the report and testimony of the physician who ex-
amined Appellant. The military judge also conducted an
extended discussion with Appellant about his wish to pro-
ceed pro se, which is typically known as a "*Faretta* collo-
quy." *Faretta v. California*, 422 U.S. 806 (1975). As sum-
marized by the ACCA:

> Throughout the colloquy, [A]ppellant consist-
> ently indicated he understood the military judge,
> that he understood the risks and limitations, and
> that he wanted to proceed with his self-represen-
> tation. He affirmed his belief that he was physi-
> cally and mentally capable to review the evidence
> and prepare for trial, and he stated he was confi-
> dent he would be ready to proceed to trial. Appel-
> lant affirmed his decision was not the result of any
> threats or force and was made of his own free will.
> Moreover, [A]ppellant expressed a willingness to
> maintain LTC KP, MAJ CM, and MAJ JM as his
> standby counsel throughout the trial, so they

---

[3] "Individual military counsel" is a military counsel of an ac-
cused's own selection if that counsel is "reasonably available" as
determined under regulations prescribed by the Secretary of the
military department in which the accused serves. Article
38(b)(3)(B), (b)(7), UCMJ, 10 U.S.C. § 838(b)(3)(B), (b)(7) (2006).

could assist him with legal research and provide
advice as needed or requested.

*Hasan*, 80 M.J. at 696.

The following brief excerpts from the lengthy exchange
between the military judge and Appellant provide addi-
tional insights:

> MJ: . . . . Do you understand that you would be
> better off with a trained lawyer who is familiar
> and knows all the procedures, the Rules of Evi-
> dence, the Military Rules of Evidence, the Rules
> for Courts-Martial and the Rules of Law than you
> would be representing yourself?
>
> ACC: I understand.
>
> MJ: Basically what I'm telling you, Major Hasan,
> as a general rule, representing yourself is not a
> good policy.
>
> ACC: You've made that quite clear.
>
> . . . .
>
> MJ: I'm going to advise you again, Major Hasan, I
> know you said earlier that I've made this perfectly
> clear, but I'm going to repeat it again. I think it's
> unwise for you to represent yourself. I think it's
> an unwise decision and I strongly urge you not to
> represent yourself. But knowing all that I've told
> you, do you still want to act as your own lawyer?
>
> ACC: Yes, ma'am.

Ultimately, the military judge was satisfied with Appel-
lant's responses during the colloquy and, in conjunction
with her review of Appellant's medical examination as well
as Appellant's Rule for Courts-Martial (R.C.M.) 706 sanity
board report, found that Appellant's waiver of counsel was
knowing, intelligent, and voluntary. She therefore ap-
proved his request to proceed pro se. However, the military
judge appointed his defense team to serve as standby coun-
sel, as reflected in the following passage from the record of
trial:

> MJ: . . . . All three of the currently detailed coun-
> sel . . . will remain as standby counsel, with [two
> of the lawyers] remaining at counsel table, and

> [one of the lawyers] remaining in the spectator gallery. Standby counsel will be noticed in all communications to and from the court. They will attend all proceedings and will be available to Major Hasan for consultation and advice.
>
> Counsel may provide you, Major Hasan, with advice and procedural instructions. They will not do anything without your agreement. However, they are available to act as your lawyer or assist you at any time. At any time during the trial you feel that you could benefit from advice and you want to take a break to talk to your counsel about something[,] let me know and I will permit it. Do you understand that?
>
> ACC: I do.

On July 2, 2013, after the military judge entered not guilty pleas on behalf of Appellant, she sought clarification on the record about whether Appellant still wanted to represent himself because Appellant had mentioned the possibility of retaining a civilian attorney. In response to inquiries from the military judge, Appellant eventually stated, "I want to proceed pro se," but he also sought to reserve the right to retain civilian counsel "if after talking to [that counsel], something fruitful evolves."

At the next session of court on July 9, 2013, Appellant stated that he met with civilian counsel and if the court allowed him to pursue the "defense of others" defense, he would elect to be represented by that civilian attorney. The military judge stated: "The court's ruling is that the defense of others [defense] fails as a matter of law. Understanding that, do you still wish to proceed pro se?" Appellant responded, "Yes, I do."

Prior to the sentencing phase of his trial, the military judge engaged in the following colloquy with Appellant:

> MJ: Do you still wish to proceed pro se, Major Hasan, knowing everything that I've told you throughout the trial about the dangers and disadvantages of self-representation; the nature of the proceedings at this stage of the trial; and the possible punishments you face?

ACC: I do.

MJ: Do you understand, as I told you on Friday, that this is the stage of the trial where the panel decides whether you should live, or whether you should die?

Do you understand that?

ACC: I understand.

MJ: And you understand that you're staking your life on the decisions that you make?

ACC: I do.

MJ: Is that a free and voluntary choice by you?

ACC: It is.

MJ: Again, I think it is unwise for you to represent yourself, but that is your choice, and you're competent to make that choice. Is that a free and voluntary choice on your part?

ACC: It is.

After this colloquy, the military judge "affirm[ed on the record her] previous findings—the accused may continue to represent himself pro se."

On appeal, Appellant argues that his "choice to proceed *pro se* was no choice at all," so the "waiver of counsel was involuntary." Appellant's Brief at 4, 48. Appellant asserts that he only elected to proceed pro se because his counsel intended to put on a defense that would have conceded guilt whereas he wanted to maintain his innocence by asserting the "defense of others" defense. Specifically, he contends that his "defense team . . . intend[ed] to attack premeditation by relying on 'religious fervor,'" a defense which "contradicted [A]ppellant's deeply held religious beliefs." *Id.* at 49. In Appellant's view, his trial defense team's insistence on pursuing their preferred trial strategy over his objection offered "a constitutionally repugnant choice" and infringed on his "constitutionally 'protected autonomy right' to control the objectives of his defense." *Id.* at 40, 43 (quoting *McCoy v. Louisiana*, 138 S. Ct. 1500, 1511 (2018)). As a result, he avers that his waiver of counsel was not truly voluntary but rather the result of "an

impasse with his detailed counsel." *Id.* at 50. Appellant also contends that the military judge failed to perform her "duty . . . to inquire into [A]ppellant's dissatisfaction with counsel before accepting [A]ppellant's waiver" when the conflict between Appellant and his standby counsel became apparent. *Id.*

Arguing that Appellant made a knowing, voluntary and intelligent waiver of counsel, the Government claims that "Appellant's argument is built upon . . . a faulty premise" that he wanted to maintain his innocence. Brief for Appellee at 23, *United States v. Hasan*, No. 21-0193, (C.A.A.F. Oct. 20, 2022) [hereinafter Appellee's Brief]. According to the Government, both Appellant's "defense of others" claim (which the military judge rejected as a matter of law) and trial defense counsel's religious fervor strategy entailed admitting that Appellant committed the shooting at Fort Hood. Therefore, the Government contends, rather than differing about fundamental objectives, Appellant and his counsel merely "differed in strategy: Appellant wanted to argue that the killing was justified, and his detailed counsel wanted to attack one of the elements of the offense, namely premeditation." *Id.* at 24.

The Government also finds it significant that at trial "Appellant did not clearly and vociferously object to his detailed counsel's planned defense," and thus did not state on the record that counsel's strategy violated his religious beliefs. *Id.* at 26. The Government further argues that "Appellant did not have good cause to substitute counsel because his detailed counsel were well-prepared and competent," and even substitute counsel "would not have given Appellant what he wanted: to present a defense that the military judge already ruled could not be presented." *Id.* at 28. The Government's final point is that the military judge had sufficient information to conclude Appellant's waiver of counsel was voluntary.

## II. Standard of Review

We review de novo whether an accused voluntarily waived his right to counsel. *See United States v. Rosenthal*,

62 M.J. 261, 262 (C.A.A.F. 2005) (per curiam) (Whether a waiver of a right was "knowing and intelligent" is "a question of law [assessed] under a de novo standard of review."); *see also United States v. Schaefer*, 13 F.4th 875, 886 (9th Cir. 2021) ("Whether a defendant knowingly and voluntarily waives his Sixth Amendment right to counsel is a mixed question of law and fact reviewed de novo." (citation omitted) (internal quotation marks omitted)).

### III. Applicable Law

### A. The Sixth Amendment Right to Counsel

The Sixth Amendment provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend VI. "That right includes the right to waive counsel and to represent oneself." *United States v. Roof*, 10 F.4th 314, 351 (4th Cir. 2021) (citing *Faretta*, 422 U.S. at 834-36). When an accused is represented by counsel, "a defendant has the right to insist that counsel refrain from admitting guilt." *McCoy*, 138 S. Ct. at 1505.

"[I]t is the defendant's prerogative, not counsel's, to decide on the objective of his defense . . . ." *Id.* However, decisions such as "what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence," and every other decision properly considered to be "[t]rial management" are left to counsel. *Id.* at 1508 (internal quotation marks omitted) (quoting *Gonzalez v. United States*, 553 U.S. 242, 248 (2008)). Included within counsel's purview is resolving a "strategic dispute[] about whether to concede an element of a charged offense." *Id.* at 1510. "Some decisions, however, are reserved for the client—notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal." *Id.* at 1508. "Autonomy to decide . . . the objective of the defense . . . belongs in this latter category." *Id.*

### B. Voluntary Waiver of Counsel

"While the Constitution does not force a lawyer upon a defendant, it does require that any waiver of the right to

counsel be knowing, voluntary, and intelligent." *Iowa v. Tovar*, 541 U.S. 77, 87-88 (2004) (citations omitted) (internal quotation marks omitted). "The [military's] current standards regarding the right of self-representation based on *Faretta* . . . are set forth in RCM 506(d) . . . ." *United States v. Mix*, 35 M.J. 283, 285 (C.M.A. 1992). This rule provides:

> The accused may expressly waive the right to be represented by counsel and may thereafter conduct the defense personally. Such waiver shall be accepted by the military judge only if the military judge finds that the accused is competent to understand the disadvantages of self-representation and that the waiver is *voluntary* and understanding. The military judge may require that a defense counsel remain present even if the accused waives counsel and conducts the defense personally. The right of the accused to conduct the defense personally may be revoked if the accused is disruptive or fails to follow basic rules of decorum and procedure.

R.C.M. 506(d) (2008 ed.) (emphasis added).

To find a valid waiver of counsel, the Supreme Court requires that the accused "voluntarily exercise[d] his informed free will." *Faretta*, 422 U.S. at 835. Our precedent provides little guidance on how to determine whether an accused's choice to represent himself was voluntary, but the federal circuit courts have addressed this issue in some detail. "[T]he voluntariness of a waiver is measured by reference to the surrounding circumstances." *Pouncy v. Palmer*, 846 F.3d 144, 161 (6th Cir. 2017). Thus, the focus is often on "mistreatment or coercion of the [accused]," i.e., whether the accused was "forced, threatened, or pressured into waiving his right to counsel." *United States v. Owen*, 963 F.3d 1040, 1049, 1051 (11th Cir. 2020); *Wilkins v. Bowersox*, 145 F.3d 1006, 1012 (8th Cir. 1998) ("a finding of coercion bears upon the voluntary aspect of the waiver"); *see also Moran v. Burbine*, 475 U.S. 412, 421 (1986) (indicating a waiver, in the context of *Miranda*[4] warnings,

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

is "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception").

Aside from this traditional concern, the United States Courts of Appeals have further stated that "the 'Hobson's choice' between proceeding to trial with an unprepared counsel or no counsel at all may violate the right to counsel" because that is no choice at all. *United States v. Washington*, 596 F.3d 926, 938 (8th Cir. 2010); *see also Pouncy*, 846 F.3d at 161; *United States v. Padilla*, 819 F.2d 952, 955 (10th Cir. 1987) ("A defendant forced to choose between incompetent or unprepared counsel and appearing pro se faces a dilemma of constitutional magnitude." (citation omitted) (internal quotations marks omitted)). In contrast, a simple disagreement with counsel about "a certain line of defense" is not enough to establish involuntary waiver of counsel. *Sanchez v. Mondragon*, 858 F.2d 1462, 1466 (10th Cir. 1988).

## IV. Discussion

Despite his phrasing of this issue, Appellant does not actually challenge the knowing or intelligent nature of his waiver of counsel. We therefore focus on the voluntariness of Appellant's waiver. And for the reasons cited below, we conclude that Appellant voluntarily waived his right to counsel and validly elected to proceed pro se.

We preliminarily note that the typical hallmarks of a voluntary waiver of counsel are present here. In the colloquy with the military judge, Appellant affirmed that his decision was not the result of any threats or force and was made of his own free will. Further, there is nothing in the record indicating that threats, coercion, or physical or psychological force were involved. Moreover, Appellant did not seek to replace members of the last iteration of his defense team but instead simply "moved to represent himself without complaining to the court that his . . . counsel was incompetent, unprepared, or otherwise unable to provide adequate representation." *United States v. Patterson*, 140

F.3d 767, 776 (8th Cir. 1998). And finally, Appellant signed a document waiving his right to counsel.

But Appellant cites to a different concern. The starting premise of Appellant's involuntary waiver claim before this Court is that if trial defense counsel had continued to represent him, "there would have been a clear constitutional violation under *McCoy*." Appellant's Brief at 48. Specifically, he argues as follows: "Appellant's waiver of counsel was not voluntary. Going into trial, he desired to maintain his innocence. By contrast, his defense team sought to admit his guilt." *Id.* at 40. But Appellant's premise is flawed and his reliance on *McCoy* is misplaced.

To begin with, Appellant's claim that at trial he "desired to maintain his innocence," *id.*, is belied by the record. While Appellant initially might have wanted to maintain his innocence by pursuing a "defense of others" defense, the military judge prohibited him from pursuing that strategy, finding it failed as a matter of law. After that ruling, Appellant made no effort to assert his innocence.[5] Instead, with full knowledge that the military judge had ruled that the "defense of others" defense failed, he still openly admitted that he was the shooter. Indeed, at the very beginning of his opening statement to the panel members, Appellant flatly declared: "The evidence will clearly show

---

[5] Appellant argues that after "his pleas [of guilty] were refused and he was compelled into a contested trial, he resolved to maintain his innocence." Reply Brief on Behalf of Appellant at 1, *United States v. Hasan*, No. 21-0193 (C.A.A.F. Jan. 3, 2023) (footnote omitted) [hereinafter Reply Brief]. He also challenges the Government's argument that he did not want to maintain his innocence and instead wanted only to pursue a meritless "defense of others" claim as a "false distinction." *Id.* at 2. As a general matter, we agree that there is no legal distinction between one who is factually innocent because he did not commit the actus reus of a crime and one who has a *valid* justification for committing what would otherwise be a criminal act. However, that distinction is not applicable in this case where, under the facts and circumstances, Appellant's claim of justification (defense of others) failed as a matter of law. *See infra* issue raised pursuant to *Grostefon*.

that I am the shooter." Then, after making this damning confession, Appellant made no discernible effort to justify or explain the shootings or to otherwise absolve himself of guilt. For example, with limited exceptions, Appellant did not cross-examine prosecution witnesses; he did not put on a case-in-chief; and he waived closing argument. As can be seen then, Appellant's actions at trial undermine his argument on appeal that he "desired to maintain his innocence." *Id.* at 40, 48.

Next, the facts in *McCoy* are distinguishable from the instant case. In *McCoy*, the defendant wanted to argue that he was not the person who killed his family. 138 S. Ct. at 1506. His counsel, on the other hand, wanted to argue that the defendant did indeed kill his family but that he lacked the criminal intent to be convicted of first-degree murder. *Id.* at 1506 n.1. The Supreme Court held that McCoy's representation by counsel who wanted to pursue a strategy admitting the killings violated his constitutionally "protected autonomy right," noting that a defendant "may wish to avoid, above all else, the opprobrium that comes with admitting" to killing someone. *Id.* at 1508, 1511. But as demonstrated above, in the instant case Appellant had no compunction about admitting that he had shot his fellow soldiers on November 5, 2009. As noted by the Government in its brief, "This case does not present an instance, as was present in *McCoy*, where the appellant desired to deny that he committed the charged acts. . . . Both Appellant and his defense counsel wanted to mount their defenses by admitting that Appellant committed the November 5, 2009 shooting." Appellee's Brief at 24.

Moreover, the Supreme Court's broader holding in *McCoy* that "a defendant has the right to insist that counsel refrain from admitting guilt, even when counsel's experience-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty," 138 S. Ct. at 1505, is inapplicable to the instant case. As discussed at greater length *infra* in Issue IV, neither Appellant nor his trial team were legally empowered to plead guilty in this case.

And finally, upon close inspection Appellant's argument fails when he asserts that he faced "'a Hobson's choice'" when he was forced to decide between accepting his counsel's objectionable defense strategy or proceeding pro se. Appellant's Brief at 47 (citation omitted). In support of his position, Appellant states that his trial team's "planned defense" would have gone against Appellant's wishes by "contradict[ing A]ppellant's deeply held religious beliefs" and "paint[ing him] as a religious fanatic." *Id.* at 49. However, after he informed the trial court of his intent to waive counsel and represent himself, the military judge engaged in the following exchange with Appellant:

> MJ: Have you tried to talk to any other lawyer about your case?
>
> ACC: No.
>
> MJ: Would you like to talk to another lawyer about this case?
>
> ACC: Not at this point. I would like to reserve the option to have feedback from another lawyer if I choose so, but not at this point.
>
> MJ: At this point you don't wish to talk to another lawyer about this case?
>
> ACC: That's correct.
>
> MJ: Do you wish to talk to another lawyer about this colloquy that we're having now about representing yourself?
>
> ACC: No, ma'am.
>
> MJ: Have you understood everything that I've told you and everything that I've asked you?
>
> ACC: Yes, ma'am.

This exchange demonstrates that Appellant's waiver was not exclusively linked to his trial defense team's legal abilities, preparedness, or religious fervor defense because Appellant denied interest in having *any* counsel represent him or talking to *any* counsel about his case.[6] Simply

---

[6] Because we conclude that Appellant's waiver of counsel was not exclusively tied to his disapproval of his trial defense

stated, by rejecting the military judge's offer to explore obtaining new counsel, Appellant foreclosed his ability to successfully argue on appeal that he was confronted with "a constitutionally repugnant choice: go to trial with counsel who were diametrically opposed to his fundamental objective or go alone." *Id.* at 40.

Similarly, in arguing against the voluntariness of his waiver of counsel, Appellant's contention that the military judge failed in her duty "to inquire into [A]ppellant's dissatisfaction with counsel before accepting [A]ppellant's waiver" misses the mark.[7] *Id.* at 50. It is true that the military judge disclaimed any interest in wanting to know *why* Appellant was dissatisfied with counsel. ("I don't want to know why you don't want to be represented by your counsel anymore, but is that a strategic decision on your part?") However, the Supreme Court and this Court have not "specif[ied] what procedural undertakings [are] necessary to satisfy" whether an accused has waived counsel. *Mix*, 35 M.J. at 286. In *Tovar*, the Supreme Court, while discussing the related issue of whether waiver of counsel was intelligent, enunciated: "We have not . . . prescribed any formula

---

counsel's religious fervor defense and because he disclaimed wanting *any* counsel, we reject his argument that the military judge was required to appoint substitute counsel.

[7] Appellant identifies the following events as creating a duty on the part of the military judge to inquire further into dissatisfaction with counsel: (1) the precipitating circumstances that led to Appellant's dissatisfaction with counsel before accepting Appellant's waiver; (2) the facts that led counsel to defy court orders to provide assistance; (3) when counsel "declared [A]ppellant was working in concert with [the] prosecution"; and (4) when Appellant "clearly vacillated on his *pro se* status" on the eve of trial. Appellant's Brief at 50. But since we find no duty to inquire in the first place, the military judge was not required to reopen the colloquy. *See United States v. Hantzis*, 625 F.3d 575, 580-81 & n.2 (9th Cir. 2010) (citing cases for the proposition that "no federal appellate court has held that renewed *Faretta* warnings are required at each subsequent court proceeding").

or script to be read to a defendant who states that he elects to proceed without counsel." 541 U.S. at 88.

This Court has previously recognized that the federal circuit courts "are split as to the exact extent of the inquiry necessary to ensure" waiver of counsel by the trial judge and has declined to identify "what type of inquiry is required." *Mix*, 35 M.J. at 286. In *Mix*, we were satisfied that the military judge conducted the appropriate waiver inquiry to determine that the accused's waiver of counsel was knowing, intelligent, and voluntary because the military judge advised appellant "on several occasions of the benefits of a lawyer and the disadvantages of representing oneself." *Id.* This Court proposed questions to ask an accused in future cases, *id.* at 286, 289-90, and indeed those questions were incorporated into the Military Judges' Benchbook, *see* Dep't of the Army, Pam. 27-9, Legal Services, ch. 2 § 2–7–2 (Jan. 1, 2010). Notably, military case law and the Benchbook do not direct the military judge to inquire about the nature of the dissatisfaction with counsel. *See id.* Therefore, under military law, the military judge did not have a duty to inquire into the reasons behind Appellant's dissatisfaction with counsel.

Appellant identifies cases from the United States Courts of Appeals for the Third and Tenth Circuits that seemingly do impose such a duty.[8] *See, e.g., United States v. Peppers*, 302 F.3d 120, 132 (3d Cir. 2002); *Sanchez*, 858 F.2d at 1466. But notably, Appellant has not identified any other federal circuit courts that have adopted this position. Our independent research has identified two more circuits that also have ostensibly imposed such a duty. *United States v. Wright*, 923 F.3d 183, 188-89 (D.C. Cir. 2019); *United States v. Seale*, 461 F.2d 345, 359 (7th Cir. 1972). However, we are not required to follow these circuit courts on this point. *See United States v. Tovarchavez*, 78 M.J.

---

[8] Appellant does cite a United States Court of Appeals for the Ninth Circuit case as well—*Garcia v. Bunnell*, 33 F.3d 1193, 1199 (9th Cir. 1994)—but that case was about conflicts of interest, not conflicts of strategy or trial objectives.

458, 466 (C.A.A.F. 2019) (acknowledging this Court can give "*persuasive* weight to the decisions of the federal circuit courts of appeal" (emphasis added)). And as we explained above, the Supreme Court and military law have not imposed a duty in a *Faretta* colloquy to inquire into any disagreement between an accused and his counsel. Accordingly, given Appellant's unwavering position on self-representation and in light of the other points raised above, the military judge did not need to inquire further into why Appellant wished to proceed pro se.

The circumstances of this case demonstrate that Appellant "voluntarily elected to [represent himself] in order to pursue his own unique vision of how the case should be defended." *United States v. Volpentesta*, 727 F.3d 666, 676 (7th Cir. 2013). We thus "reject his current efforts to characterize as 'involuntary' a choice that was entirely of his own making." *Id.*

### Issue II: Whether the Total Closure of the Court over Appellant's Objection Violated His Right to a Public Trial

At the outset, it is important to note that the reference to the "total" closure of the court does not refer to the closure of the courtroom during *all* of Appellant's court-martial proceedings. Rather, it refers to the fact that the military judge closed the courtroom to *all* spectators—as well as to the bailiffs and Government counsel—during one thirty-four minute Article 39(a), UCMJ, session.[9]

---

[9] *See United States v. Thompson*, 713 F.3d 388, 395 (8th Cir. 2013) ("Whether a closure is total or partial . . . depends not on how long a trial is closed, but rather who is excluded during the period of time in question."). Here, the only people present in the courtroom for the closed proceeding were the military judge, the court reporter, Appellant, and his three standby counsel. *See also United States v. Allen*, 34 F.4th 789, 797 (9th Cir. 2022) ("A total closure of the courtroom means that '*all* persons other than witnesses, court personnel, the parties and their lawyers are excluded for the duration of the hearing.'" (citation omitted)); *United States v. Simmons*, 797 F.3d 409, 413 (6th Cir. 2015) ("a total closure involves excluding all persons from the courtroom

Appellant challenges this decision by the military judge, arguing that her ruling violated both the Sixth Amendment and R.C.M. 806. He essentially makes three criticisms of the military judge's closure decision: (1) she failed to make findings *before* closing the courtroom; (2) her findings, once made, were inadequate and conclusory; and (3) she failed to consider reasonable alternatives to the courtroom closure. Appellant further claims that this improper closure constitutes structural error, which warrants automatic reversal.

We will assume without deciding that the military judge did not comply with the relevant constitutional and regulatory standards when she briefly closed Appellant's court-martial. However, as explained below, under the circumstances of this case any noncompliance with these standards by the military judge does not entitle Appellant to the remedy that he seeks—reversal of the findings and sentence and a retrial.

## I. Background

During trial, Appellant's conduct led standby counsel[10] to believe that Appellant was "working in concert . . . with the prosecution towards a death sentence." Because standby counsel concluded that "providing even procedural assistance" under these circumstances was "contrary to [counsel's] professional obligations," they filed a motion— which they served on Government counsel—seeking to "withdraw from assisting [Appellant] in any manner." Included in this motion was an enclosure containing counsel's entire mitigation case. Before Government counsel had the opportunity to review this enclosure, however, the military judge sealed the motion and all its enclosures.

The military judge then held an Article 39(a), UCMJ, session on the motion. At the outset, Appellant requested

---

for some period" (citing *Judd v. Haley*, 250 F.3d 1308, 1316 (11th Cir. 2001)).

[10] There were three standby counsel at the time of the court closure—LTC KP, LTC CM, and MAJ JM.

"an in camera hearing" to discuss the motion. Despite recognizing "the sensitivities here," the military judge began the hearing in open court while trying to limit the public discussion of details of the conflict between standby counsel and Appellant. In doing so, she indicated that she would "revisit" Appellant's request "in just a moment."

In open court, the military judge first elicited the views of standby counsel. Counsel stated that it had become "clear that [Appellant's] goal [was] to remove impediments or obstacles to the death penalty, and [he was], in fact, encouraging or working towards a death penalty." Appellant immediately objected to this belief as "a twist of the facts." The military judge asked standby counsel not to go "into specifics in this forum," and she sought to clarify counsel's motion.

After standby counsel expressed their views, the military judge had the following exchange with Appellant:

> MJ: Major Hasan, do you have anything that you would like to present to the court [on] this matter ex parte? And if so, I'm going to give you the opportunity to do that in writing.
>
> ACC: I have—I'd like to do that right now, ma'am, because I—
>
> MJ: Right now, we're not in an ex parte setting, and I want to you give that opportunity. . . .
>
> ACC: It is done now, ma'am. I wanted it to start ex parte, but in regards to—
>
> MJ: Hold on there a minute, Major Hasan. I was very careful here not to go into any type of specifics in there, so I'm giving you the opportunity to present matters to me ex parte, and I want you to do that in writing.
>
> ACC: I object, and I'd like to do that briefly, if I may?
>
> . . . .
>
> MJ: Are you specifically waiving any privileges— I don't know what you're planning on going into here—but are you specifically waiving any

> privileges, and you want to discuss this matter in a non-ex parte setting?
>
> ACC: Yes, ma'am.
>
> MJ: Is anybody forcing you to make that decision?
>
> ACC: No, ma'am.
>
> MJ: I'm giving you the opportunity to present your argument, or anything else that you want me to consider, in an ex parte forum.
>
> ACC: I understand. I don't think it is what you think it is, ma'am. I just want to clarify about [LTC KP's] assertion of me seeking the death penalty.
>
> MJ: I would prefer that you give that to me in writing.
>
> ACC: I object, ma'am.
>
> MJ: You're not going to give me anything in writing?
>
> ACC: No, ma'am. Your Honor, [LTC KP] has made an assertion— . . . . and I feel compelled to clarify the issue.
>
> MJ: You objected to what [LTC KP] said is what you're telling me?
>
> ACC: It isn't accurate, and I'd like to clarify that.
>
> MJ: Hold on. I'm going to conduct the rest of this hearing as an ex parte hearing. I'm going to clear the courtroom. That includes you, Bailiff.

As indicated below, the military judge later stated on the record that her purpose in temporarily closing the courtroom was to protect attorney work product and attorney-client communications. However, she did not make any findings before she closed the courtroom.

During the closed hearing, while discussing enclosures to the trial defense counsel's motion, Appellant requested of the military judge, "Please unseal everything." Appellant elaborated:

> The part of the unsealing, ma'am, is that if we had done this in camera before all this began, that would've been my preference, but now that the

> whole idea that I'm seeking the death penalty is out, I feel compelled to address that, not just in front of you, but in front of the media that's hearing this. This is my reputation, my principles at stake here, and I don't want anybody to get a misrepresentation of—they might think, 'Hey, this guy is crazy because he is seeking the death penalty.' I feel compelled to clarify that and say, hey, I'm not crazy, this is just a matter of principle. The Mujahideen, this is what we do. This is what we are. There's [sic] others like me that believe the same.

This closure of the courtroom lasted thirty-four minutes out of a seventeen-day trial (from opening statements to the announcement of the sentence) and covered thirteen pages of a more than two-thousand-page trial transcript.

The following day, the military judge explained her rationale for closing the proceedings as follows:

> I closed the court yesterday to the public and had an *ex parte* 39(a) session. I do that on very rare occasions, and I do it pursuant to Rule for Court-Martial 806. In this particular instance, I believed that we needed to do that to address some issues that arose between standby counsel and [Appellant], and issues relating to the release of privileged attorney work product, attorney/client, and other privileged communications. There was substantial probability that an overriding interest [in] retaining the confidentiality of those communications would be prejudiced if the proceedings remained open, and I believed that other means to address the issue were inadequate.

On July 6, 2022, almost nine years after the closed Article 39(a), UCMJ, session occurred, this Court unsealed the transcript of that session.[11]

---

[11] The delay in unsealing this portion of the transcript is explainable by the following facts. The military judge believed the transcript contained privileged material and did not unseal it for that reason. During oral argument before the lower appellate court, appellate defense counsel was asked whether Appellant consented to the disclosure of the concealed material, and

## II. Standard of Review

This Court reviews whether a military judge properly closed courtroom proceedings for an abuse of discretion. *United States v. Ortiz*, 66 M.J. 334, 338 (C.A.A.F. 2008). Although Appellant raised this issue for the first time in this Court, the parties agree that this abuse of discretion standard applies to the instant case. In this situation, we concur.

## III. Applicable Law

"In all criminal prosecutions, the accused shall enjoy the right to . . . a public trial." U.S. Const. amend. VI.[12] "Without question, the [S]ixth-[A]mendment right to a public trial is applicable to courts-martial." *United States v. Hershey*, 20 M.J. 433, 435 (C.M.A. 1985) (footnote omitted); *see also United States v. Short*, 41 M.J. 42, 43 (C.A.A.F. 1994) ("The Sixth Amendment right to a public trial is applicable to courts-martial."). In addition to the Sixth Amendment, there is a regulatory right to open courts-martial. R.C.M. 806(a) (2008 ed.) ("Except as

---

defense counsel declined to give a responsive answer on Appellant's behalf. And then, it was not until May 2022 that Appellant filed a motion with this Court asking that the transcript pages from the closed hearing be unsealed. We granted that motion two months later, thereby making the material public. *United States v. Hasan*, 82 M.J. 422, 422-23 (C.A.A.F. 2022) (order).

[12] The First Amendment also gives the public the right of access to criminal trials. *Presley v. Georgia*, 558 U.S. 209, 212 (2010) (per curiam) (citing *Press-Enter. Co. v. Superior Ct. of Cal.*, 464 U. S. 501, 501 (1984)). "There can be no doubt that the general public has a qualified constitutional right under the First Amendment to access to criminal trials." *United States v. Travers*, 25 M.J. 61, 62 (C.M.A. 1987). "[W]hen an accused is entitled to a public hearing, the press enjoys the same right and has standing to complain if access is denied." *ABC, Inc. v. Powell*, 47 M.J. 363, 365 (C.A.A.F. 1997). However, the Supreme Court has not decided "[t]he extent to which the First and Sixth Amendment public trial rights are coextensive," labeling this issue "an open question." *Presley*, 558 U.S. at 213.

otherwise provided in this rule, courts-martial shall be open to the public.").

Conducting criminal trials in public is of paramount constitutional concern. Public trials ensure that judges and prosecutors act professionally; they reduce the chances of arbitrary and capricious decision-making; they encourage witnesses to come forward; they discourage perjury; and they enhance public confidence in the court system. *See Waller v. Georgia*, 467 U.S. 39, 46 (1984) (noting that with a public trial, "the public may see [the accused] is fairly dealt with and not unjustly condemned" and the public "may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions" (citation omitted) (internal quotation marks omitted)). As our predecessor court stated, "public confidence in matters of military justice would quickly erode if courts-martial were arbitrarily closed to the public." *Travers*, 25 M.J. at 62.

Despite this general rule, both the Sixth Amendment and R.C.M. 806 make exceptions to the right to have a public trial. *Waller*, 467 U.S. at 45 ("the right to an open trial may give way in certain cases to other rights or interests"); R.C.M. 806(a) (2008 ed.) ("Except as otherwise provided in this rule, courts-martial shall be open to the public."). "Nonetheless, 'the exclusion must be used sparingly with the emphasis always toward a public trial.'" *Short*, 41 M.J. at 43 (quoting *United States v. Grunden*, 2 M.J. 116, 120 (C.M.A. 1977)).

In *Waller*, the Supreme Court's seminal Sixth Amendment case on the right to a public trial, the Court announced the following standard for closing a trial:

> [T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

467 U.S. at 48 (citing *Press-Enter. Co.*, 464 U. S. at 511-12).[13]

R.C.M. 806 mirrors the *Waller* test as follows:

> Courts-martial shall be open to the public unless (1) there is a substantial probability that an overriding interest will be prejudiced if the proceedings remain open; (2) closure is no broader than necessary to protect the overriding interest; (3) reasonable alternatives to closure were considered and found inadequate; and (4) the military judge makes case-specific findings on the record justifying closure.

R.C.M. 806(b)(2) (2008 ed.).[14]

## IV. Discussion

It is important to note that the military judge was presented with a difficult situation here. Appellant was proceeding pro se, and the military judge was trying to protect Appellant from publicly disclosing information that might

---

[13] Although the *Waller* test specifically deals with when a *party* seeks closure, we conclude that this test equally applies to a military judge's sua sponte decision to close a courtroom. *See United States v. Candelario-Santana*, 834 F.3d 8, 23 (1st Cir. 2016) (applying the W*aller* test where "Government did not request a closure"); *Tucker v. Superintendent Graterford SCI*, 677 F. App'x 768, 770 (3d Cir. 2017) (applying *Waller* test after noting that the trial judge closed the courtroom following "an off-the-record discussion with counsel in chambers"); *United States v. Honken*, 438 F. Supp. 2d 983, 986 (N.D. Iowa 2004) (applying the *Waller* test when determining whether the court would sua sponte close a hearing on the motion for an anonymous jury).

[14] The parties agree that the same standard applies to both the constitutional and the R.C.M. court closure claims. We concur. *See* R.C.M. 806(b)(2) Discussion (2008 ed.) ("A session may be closed over the objection of the accused or the public upon meeting the constitutional standard set forth in this Rule."); *Manual for Courts-Martial, United States*, Analysis of the Rules for Courts-Martial app. 21 at A21-48 (2008 ed.) ("The rules on closure now in subsection (b)(2) and the Discussion were amended in light of military case law that has applied the Supreme Court's constitutional test for closure to courts-martial.").

be damaging to his own defense. Her concern was heightened because: the issue under discussion involved matters pertaining to attorney-client privilege; the standby counsel's motion contained privileged information; and Appellant's stance on whether he waived his privilege regarding such matters was confusing. Nevertheless, we will assume without deciding that the military judge abused her discretion in briefly closing Appellant's court-martial. Upon doing so, however, we conclude that Appellant is not entitled to have his findings and sentence set aside.

In *Weaver v. Massachusetts*, the Supreme Court stated that this "constitutional violation—the courtroom closure—has been treated . . . as a structural error." 582 U.S. 286, 290 (2017).[15] Importantly however, in *Waller* the Supreme Court stated that when there has been "a violation of the public-trial guarantee. . . .[,] the remedy should be appropriate to the violation" and warned against imposing a remedy that "would be a windfall for the defendant, and not in the public interest." 467 U.S. at 49-50 (footnote omitted). Such a pronouncement runs contrary to the notion that a conviction obtained in the face of a public trial violation should be automatically overturned without further analysis. Moreover, the United States Court of Appeals for the Second Circuit has underscored that "the [Supreme] Court has never said, much less ruled, that any conviction following an erroneous closure must be vacated." *Jordan v. Lamanna*, 33 F.4th 144, 153 (2d Cir. 2022).

At oral argument, Appellant argued that *Weaver*, 582 U.S. at 290, and *Presley*, 558 U.S. at 209, overruled this aspect of *Waller*. Our reading of those cases indicates otherwise. *Presley*, 558 U.S. at 211-16, did not address this issue, and *Weaver*, 582 U.S. at 296-97, did not explicitly

---

[15] R.C.M. 806 does not specify a remedy for a violation of its requirement that "[c]ourts-martial shall be open to the public." Because the same standard applies under both the Constitution and the rule to determine whether a public trial violation has occurred, we hold that the remedy for a violation of R.C.M. 806 must also be the same.

overrule this key facet of *Waller*. And we pointedly note, "overruling by implication is disfavored." *United States v. Pack*, 65 M.J. 381, 383-84 (C.A.A.F. 2007) (citing *Eberhart v. United States*, 546 U.S. 12, 19-20 (2005); *State Oil Co. v. Khan*, 522 U.S. 3, 19 (1997); *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989)). Indeed, the Supreme Court has stated that its decisions, such as in *Waller*, "remain binding precedent until [it] see[s] fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality." *Hohn v. United States*, 524 U.S. 236, 252-53 (1998).

Moreover, the Supreme Court has acknowledged that not *all* structural errors merit automatic reversal. *Weaver*, 582 U.S. at 297 (noting that "despite the structural aspect of the violation" in *Waller*, "the Court did not order a new trial"). Indeed, the Court stated that "in the case of a structural error where there is an objection at trial and the issue is raised on direct appeal, the defendant *generally* is entitled to 'automatic reversal' regardless of the error's actual 'effect on the outcome.' " *Id.* at 299 (emphasis added) (quoting *Neder v. United States*, 527 U.S. 1, 7 (1999)); *see also id.* at 305 ("When a structural error is preserved and raised on direct review, the balance is in the defendant's favor, and a new trial *generally* will be granted as a matter of right." (emphasis added)); *State v. Schierman*, 438 P.3d 1063, 1081 n.15 (Wash. 2018) ("Thus, *Waller* illustrates the fact that a new trial is not always the remedy for the structural error of courtroom closure. *See also Weaver . . .* , [582] U.S. [at 297] . . . (noting that *Waller* did not grant the remedy of a new trial 'despite the structural aspect of the violation')."). Therefore, in this case where we assume that the military judge erred in closing the Article 39, UCMJ, session, we look to the Supreme Court's foundational case on this topic—*Waller*—and adhere to its ruling that when there has been "a violation of the public-trial guarantee. . . .[,] the remedy should be appropriate to the violation," and a remedy should not be imposed that "would be

a windfall for the defendant, and not in the public interest." *Waller*, 467 U.S. at 49-50 (footnote omitted).[16]

In this context, Appellant claims that "the only appropriate result is reversal." Appellant's Brief at 67. We disagree. Such a remedy would be grossly disproportionate to the violation. This is true for a number of reasons.

First, the closure of the Article 39(a) session was brief. As indicated above, it lasted only thirty-four minutes, and it covered only thirteen pages in the transcript.

Second, the closed hearing did not involve witness testimony, the admission of evidence, or any other matter directly related to the findings or sentence in this case.

Third, the military judge explored reasonable alternatives to closing the hearing. She initially kept the hearing open and instructed Appellant and his counsel not to discuss privileged material. It was only when she grew concerned that this approach may not work that she ultimately closed the hearing. The military judge also sought to protect the privileged material by having Appellant submit his concerns in writing—but he refused. Specifically, as noted above, the following exchange occurred:

> MJ: Major Hasan, do you have anything that you would like to present to the court [on] this matter ex parte? And if so, I'm going to give you the opportunity to do that in writing.
>
> . . . .
>
> ACC: I object . . . .

---

[16] We recognize this Court stated in *Ortiz* that an "erroneous deprivation of the right to a public trial is structural error, which requires this Court to overturn Appellant's conviction without a harmlessness analysis." 66 M.J. at 342. However, as we have explained, the Supreme Court made clear in *Waller* that not all public trial structural errors lead to automatic reversal. 467 U.S. at 49-50. Therefore, to the extent that *Ortiz* required automatic reversal of a conviction for a Sixth Amendment public trial violation, we overrule *Ortiz* and adopt the approach provided in *Waller*.

. . . .

MJ: I would prefer that you give that to me in writing.

ACC: I object, ma'am.

MJ: You're not going to give me anything in writing?

ACC: No ma'am . . . .

Fourth, the military judge placed her reasons for closing the hearing on the record—albeit after the fact rather than before the fact.

Fifth, contrary to Appellant's assertions, these findings by the military judge were not inadequate. It is clear from the record—both before the hearing was closed and in the subsequent findings—that the military judge was motivated by a concern for protecting Appellant's rights. These concerns by the military judge were heightened by the fact that there was an apparent rift between Appellant and his standby counsel, and Appellant—who was proceeding pro se—had no legal training that would help him discern whether the disclosure of potentially privileged material in open court would be harmful to his defense. Moreover, the military judge's ex post explanation for the closure of the courtroom was clear. She stated that the Article 39(a) hearing involved "issues relating to the release of privileged attorney work product [and] attorney/client[] and other privileged communications." She further stated as follows: "There was substantial probability that an overriding interest of retaining the confidentiality of those communications would be prejudiced if the proceedings remained open, and I believed that other means to address the issue were inadequate."

And sixth, this Court has now unsealed the transcript of the closed session and the public can readily see what happened during that hearing.[17] Specifically, the public now knows that during the closed session the military

---

[17] Even Appellant acknowledges that the release of the transcript was a reasonable alternative, at least at the trial level.

judge acted professionally and did not engage in arbitrary or capricious decision-making, and that neither the military judge nor standby counsel infringed the rights or interests of Appellant in any way, thereby enhancing public confidence in the court system. *See Waller*, 467 U.S. at 46; *Press-Enter. Co.*, 464 U.S. at 512; *cf. Weaver*, 582 U.S. at 304 (finding that the trial at issue was not fundamentally unfair in the ineffective assistance of counsel context when counsel did not object to the court closure because, in part, "there was a record made of the proceedings that does not indicate any basis for concern, other than the closure itself").

Therefore, because reversal of the findings and sentence in this case would not "be appropriate to the violation" and would constitute a "windfall" for Appellant that would not be "in the public interest," *Waller*, 467 U.S. at 50, we decline to impose the remedy sought by Appellant.

### Issue III: Whether the Military Judge Erred by Failing to Disqualify Lieutenant Colonel KG as a Panel Member

Appellant challenges the military judge's failure to sua sponte excuse LTC KG from serving as a panel member. Appellant claims that LTC KG exhibited actual and implied bias through his panel questionnaires, his voir dire responses, and the content of a bumper sticker affixed to his vehicle. Thus, although Appellant did not challenge LTC KG for cause and did not exercise his peremptory challenge to remove LTC KG or anyone else from his court-martial panel, he now asserts on appeal that the military judge erred by failing to "disqualify" LTC KG and argues that he "must be granted a rehearing before an impartial panel." Appellant's Brief at 68, 84. Despite Appellant's contentions, we hold that the military judge did not err by declining to exercise her discretionary authority to sua sponte excuse LTC KG under R.C.M. 912(f)(4) (2008 ed.).

### I. Background

LTC KG was selected by the convening authority to serve as a prospective panel member at Appellant's court-

martial. LTC KG twice submitted answers to a panel member questionnaire. In his first set of responses LTC KG gave answers that were concerning. Among other things, he agreed he was "affected . . . in a personal way" by the shootings, he knew a significant number of details about the facts of the case, he said he was angry about the Fort Hood attack, he agreed with the statement that soldiers who kill fellow soldiers "should not be given the same rights as other criminal defendants," he had a bumper sticker on his car reading "Major League Inf[i]del," and most importantly, he admitted that he was not confident that he could be impartial and that he already had an impression that Appellant was guilty.

Approximately nine months later and unprompted by either party, LTC KG filled out the panel member questionnaire a second time. His stated reason for doing so was as follows: "When I first filled [out the questionnaire] nine months ago, I was in the throes of battalion command and had [a] darker view of issues and [was] under a considerably greater level of stress." In his second set of responses, LTC KG gave different answers to several questions. Despite these circumstances, during voir dire Appellant—who was proceeding pro se—did not challenge LTC KG for cause or use a peremptory challenge to strike him from the panel. In fact, when questioned by the military judge about this matter, Appellant agreed that he was specifically waiving all challenges for cause against a group of members that included LTC KG.

## II. Applicable Law

When an accused believes there are grounds for challenging a member following voir dire, the accused "shall state [his or her] challenges for cause." R.C.M. 912(f)(2) (2008 ed.). Ordinarily, an accused waives a ground for challenge "if the [accused] knew of or could have discovered by the exercise of diligence the ground for challenge and failed to raise it in a timely manner." R.C.M. 912(f)(4) (2008 ed.). "Notwithstanding the absence of a challenge or waiver of a challenge by the parties, the military judge may, in the interest of justice, excuse a member against whom a

challenge for cause would lie." *Id.* Under this rule, "[a] military judge has the discretionary authority to sua sponte excuse [a] member but has no duty to do so." *United States v. McFadden*, 74 M.J. 87, 90 (C.A.A.F. 2015). A military judge's "decision whether or not to excuse a member sua sponte is subsequently reviewed for an abuse of discretion." *United States v. Strand*, 59 M.J. 455, 458 (C.A.A.F. 2004); *see also United States v. Akbar*, 74 M.J. 364, 397 (C.A.A.F. 2015).

### III. Discussion

It is essential to underscore at the outset of this discussion that, as we held in *McFadden*, a military judge has no *duty* to exercise his or her authority to excuse a panel member who has not been challenged by either party. 74 M.J. at 90. This holding is based squarely on the plain language of the applicable Rule for Courts-Martial. As we explained in *McFadden*, R.C.M. 912(f)(4) states that a military judge "*may*, in the interests of justice, excuse a member." (Emphasis added.) *See Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 346 (2005) ("The word 'may' customarily connotes discretion."); Bryan A. Garner, *Garner's Dictionary of Legal Usage* 568 (3d ed. 2011). Thus, the exercise of that authority is discretionary. In the course of deciding whether a military judge abused that discretion, it is necessary for this Court to review the facts that were before the trial court.

Here, the military judge was aware of a number of important points. To begin with, she knew she had fully apprised Appellant about: the panel selection process; Appellant's ability to ask questions of members during voir dire; Appellant's ability to challenge members for cause; and Appellant's ability to exercise a peremptory challenge. She also knew that Appellant seemingly understood this process because he submitted general voir dire questions; withdrew some of these questions; requested individual voir dire of members;[18] asked questions of a number of

---

[18] Appellant even asked the military judge to provide a prospective panel member with that member's "thesis" on the

prospective panel members—including LTC KG; requested and was granted the right to recall a particular member for additional questions; and joined the Government in successfully seeking the excusal of a member of the venire. Furthermore, Appellant recognized "a clear discrepancy" between a specific prospective member's answers on his questionnaire and his answers during voir dire. By taking these steps, Appellant demonstrated to the military judge his knowledge of the voir dire process, as well as his willingness to avail himself of the protections afforded by that process as he saw fit.

Further, the military judge knew that although Appellant was proceeding pro se, he had standby counsel who could instruct him on how to challenge prospective panel members. And importantly, she also knew that Appellant had been provided with the services of a self-selected, government-funded jury consultant on whom Appellant could rely.

Next, the military judge knew that in light of LTC KG's self-initiated reassessment of his responses to the panel member questionnaire and his answers during voir dire, LTC KG could be perceived as having "rehabilitated" himself for court-martial purposes and as having displayed a welcome ability to reconsider any reflexive positions he had previously taken in regard to this case. Specifically, LTC KG affirmed during individual voir dire with the military judge that he could decide the case "based solely on the evidence admitted in court," could follow the judge's instructions, and knew of no reason why he could not be impartial.

Also, the military judge knew that Appellant had unequivocally chosen not to challenge LTC KG for cause or to use a peremptory challenge to remove him from the court-martial panel. Indeed, the military judge directly addressed this point *twice* with Appellant. After LTC KG and one set of panel members participated in individual voir

Afghanistan insurgency so that, prior to Appellant's questioning, the member could refresh his recollection about what he had written.

dire, Appellant had the following exchange with the military judge:

> MJ: Major Hasan, do you have any challenges for cause?
>
> ACC: I do not.
>
> MJ: Are you specifically waiving any challenges for cause of the remaining members?
>
> ACC: Yes, ma'am.

And later, when the military judge gave Appellant another chance to challenge members for cause, Appellant did not take this opportunity to challenge LTC KG (or any other member). Instead, he responded, "No, ma'am," to the military judge's question, "[D]id you have any challenge for cause of any member?"

When deciding whether to exercise her discretionary authority to excuse LTC KG under R.C.M. 912(f)(4), the military judge could properly consider all of these indications that Appellant had made an informed and intentional decision not to challenge LTC KG. As a consequence, she also could properly consider the fact that an accused's judgment about whom he wants to sit in judgment of him at trial can be highly personal and, perhaps, idiosyncratic. As the United States Court of Appeals for the Eleventh Circuit has recognized, "The selection of a jury is by nature a subjective process which relies heavily on the instincts of the attorneys [or a pro se accused], the atmosphere in the courtroom, and the reactions of the potential jurors to questioning." *United States v. Williams*, 936 F.2d 1243, 1246 (11th Cir. 1991); *see also United States v. Turner*, 674 F.3d 420, 436 (5th Cir. 2012) (acknowledging "the subjective nature of jury selection"). Moreover, we note that this Court must be circumspect in using a cold record to second-guess a military judge's decision not to sua sponte excuse a panel member whom both parties apparently wanted to sit on the case. *Cf. Uttecht v. Brown*, 551 U.S. 1, 9 (2007) ("Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals

who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors."). Taking these factors into account, we find no basis for this Court to conclude that the military judge abused her discretion in declining to exercise her discretionary authority to sua sponte excuse LTC KG. After all, under an abuse of discretion standard, there "must be more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *United States v. Black*, 82 M.J. 447, 451 (C.A.A.F. 2022) (citation omitted) (internal quotation marks omitted). Here, the military judge's action did not meet these criteria.

In light of the circumstances discussed above, we conclude that the military judge did not abuse her discretion when she declined to exercise her discretionary authority to sua sponte excuse LTC KG under R.C.M. 912(f)(4).

## Issue IV: Whether Article 45(b)'s Prohibition Against Guilty Pleas to Capital Offenses Is Constitutional

## &

## Issue V: Assuming Arguendo that Article 45(b) Is Constitutional, Whether its Application in this Case Nonetheless Constituted Reversible Error

At the time of Appellant's trial, Article 45(b), UCMJ, prohibited an accused from pleading guilty to "any charge or specification alleging an offense for which the death penalty may be adjudged."[19] Appellant raises both a

---

[19] 10 U.S.C. § 845(b) (2012). Article 45(b) now provides: "A plea of guilty by the accused may not be received to any charge or specification alleging an offense *for which the death penalty is mandatory*." 10 U.S.C. § 845(b) (2018) (emphasis added). Thus, this amendment "permit[s] an accused to enter a guilty plea in a capital case in which the death penalty is not mandatory." David A. Schlueter, *Reforming Military Justice: An Analysis of the Military Justice Act of 2016,* 49 St. Mary's L. J. 1, 58 (2017). According to the R.C.M. 910(a)(1) Discussion (2019 ed.), "There are

constitutional challenge to this article and a challenge to this Court's statutory interpretation of this provision. Specifically, Appellant argues that "Article 45(b)'s prohibition on guilty pleas to capital offenses is an impermissible restriction on a competent accused's right of autonomy to make his defense." Appellant's Brief at 84. Even if this prohibition is constitutional, he argues that "its application to [A]ppellant's offers to plead guilty in the alternative to *non-capital* offenses constituted reversible error" because the decision in *United States v. Dock*, 28 M.J. 117 (C.M.A. 1989), was "poorly reasoned." *Id.* at 100-01. We conclude that Appellant is not entitled to relief.

## I. Background

After referral of the charges in this case, Appellant filed notice with the trial court of his intent to plead guilty, proposing three options. Under the first option, he offered to plead guilty as charged to premeditated murder and attempted premediated murder. Under the second option, he offered to plead guilty to unpremeditated murder and attempted premeditated murder. And under the third option, he offered to plead guilty to unpremeditated murder and attempted unpremeditated murder.

The military judge rejected Appellant's offer to plead guilty as charged to premediated murder and attempted premediated murder, ruling that such a plea was "contrary to Article 45(b) and . . . [thus option one was] not legally permissible."

Regarding Appellant's offer to plead guilty to unpremeditated murder and attempted premeditated murder, the military judge ruled it was "not legally permissible under *United States v. Dock* at 26 MJ 620 [(A.C.M.R. 1988)], 28 MJ 117 [(C.M.R. 1989)], and also, the case of *United States v. McFarlane* at [8 C.M.A 96] 23 CMR 320 [(1957)], because of the concept of transferred premeditation. It would be possible for the accused to be

_____

no offenses under the UCMJ for which a sentence of death is mandatory."

convicted of the charged capital offense without presenting any additional evidence . . . . [A]nd therefore, option two is not legally permissible."

The military judge also rejected Appellant's offer to plead guilty to unpremeditated murder and attempted unpremeditated murder. She reasoned as follows:

> [T]he court believes that accepting a plea to option number three would be the functional equivalent to pleading guilty to a capital offense. If the government did not put on any additional evidence beyond the accused's plea, could the accused be found guilty of a capital offense under Article 120 [sic], subparagraph one? Strictly speaking, no, but practically speaking, because of the facts and context of this case, the answer would be yes. The court also relies on *United States v. Simoy*, 46 MJ 592, an Air Force Court of Criminal Appeals case from 1996, 50 MJ 1, Court of Appeals for the Armed Forces, 1998.

> The offense[] of attempted unpremeditated murder requires both the intent to kill, and an act that is more than mere preparation, and demonstrates the accused's resolve to commit the offense. The difference between that and the premeditated design to kill is very slight. You couple that with a number of acts that form the basis for the attempted murders and murders that happened in sequence, the four corners of the record will be that the accused is functionally admitting to a capital offense in violation of Article 45.

> So, in other words, it is not the elements so much, but the factual predicate in this particular case, that is, the killing of 13 people over a period of time, the elements themselves will not support premeditation, but the facts supporting the elements would, and therefore, accepting a plea to option number three would be the functional equivalent to pleading guilty to a capital offense in violation of Article 45 of the Uniform Code of Military Justice.

(Second set of brackets in original.)

Responding to a motion for reconsideration, the military judge "adhere[d] to [her] original ruling" and denied the defense request "to accept a plea of guilty to unpremeditated murder and attempted unpremeditated murder." However, in seeking to address Appellant's expressed concerns, during the sentencing phase of the trial the military judge repeatedly offered to instruct the panel that Appellant had desired to plead guilty to the charged offenses but was not permitted to do so by operation of law. Appellant nevertheless expressly declined that instruction and affirmatively asked the military judge to "[n]ot instruct [the panel] at all."

## II. Issue IV: Constitutional Challenge to Article 45(b), UCMJ[20]

Appellant argues that Article 45(b)'s prohibition against guilty pleas to capital offenses, runs afoul of the " 'protected right of autonomy' to maintain innocence or admit guilt" described in *McCoy*, 138 S. Ct. 1500. Appellant's Brief at 84. Appellant also argues that "this Court should overturn *United States v. Matthews*, 16 M.J. 354 (C.M.A. 1983) and its progeny, and find Article 45(b)'s prohibition unconstitutional" because of two intervening Supreme Court decisions—*McCoy* and *Weiss v. United States*, 510 U.S. 163 (1994). Reply Brief at 41. Appellant maintains that this denial of his offer to plead guilty resulted in structural error, entitling him to a rehearing.

### A. Standard of Review

"The constitutionality of an act of Congress is a question of law that we review de novo." *United States v. Ali*, 71 M.J. 256, 265 (C.A.A.F. 2012).

### B. Discussion

This Court has repeatedly affirmed the constitutionality of Article 45(b), UCMJ. *See Akbar*, 74 M.J. at 400

---

[20] Appellant raised this issue for the first time before the ACCA in the form of a motion for reconsideration. Thus, the lower court declined to consider it. *Hasan*, 2021 CCA LEXIS 114, at *1-2.

(rejecting the appellant's contention that "the panel's consideration of mitigation evidence was unconstitutionally limited by the [Article 45(b)] prohibition against guilty pleas in capital cases" and citing *United States v. Gray*, 51 M.J. 1, 49 (C.A.A.F. 1999); *United States v. Loving*, 41 M.J. 213, 292 (C.A.A.F. 1994); and *Matthews*, 16 M.J. at 362-63). Indeed, in *Matthews*, our predecessor court stated:

> [W]e are unaware of any constitutional right to plead guilty in capital cases. Furthermore, in light of the special treatment given to capital cases by courts and legislatures and the irreversible effect of executing a capital sentence, we do not believe that Congress acted arbitrarily by providing in the Uniform Code that an accused [servicemember] cannot plead guilty to a capital charge.

16 M.J. at 362-63.

Nevertheless, Appellant argues that *Weiss* and *McCoy* undermine our precedent on this issue. We find these arguments unpersuasive.

In *Weiss*, the Supreme Court adopted the following standard for determining whether a due process challenge to a facet of the military justice system should prevail: "the factors militating in favor of [the challenged aspect of the military justice system] are so extraordinarily weighty as to overcome the balance struck by Congress." *Weiss*, 510 U.S. at 177-78 (internal quotation marks omitted) (quoting *Middendorf v. Henry*, 425 U.S. 25, 44 (1976)).

Attempting to apply the *Weiss* holding to his case, Appellant identifies the following "weighty considerations," which he asserts militate in favor of this Court striking down Article 45, UCMJ, as unconstitutional on due process grounds: (1) a guilty plea may spare an accused from death by demonstrating that he has taken responsibility; (2) a not guilty plea may have dire consequences; (3) a guilty plea may spare an accused and his family from protracted courtroom proceedings; and (4) a guilty plea respects an accused's right to autonomy to make a strategic choice to acknowledge his crime.

These "weighty considerations" are not unique to this case. Further, although *Weiss* was decided in 1994, as recently as 2015 this Court specifically upheld the constitutionality of Congress's decision under Article 45(b), UCMJ, to prohibit guilty pleas to any charges or specifications alleging offenses for which the death penalty may be adjudged. *Akbar,* 74 M.J at 400. And yet despite this precedent, and despite the fact that Appellant's *Weiss* analysis, standing alone, is not compelling, Appellant has failed to engage in a stare decisis analysis. *United States v. Cardenas*, 80 M.J. 420, 423 (C.A.A.F. 2021) (listing the stare decisis factors for overturning precedent). This Court finds no reason to overturn our precedent in this area of the law, and being offered no stare decisis analysis by Appellant, we conclude that his reliance upon *Weiss* is misplaced.

Turning to *McCoy*, Appellant asserts that the Sixth Amendment right of autonomy recognized in that case undermines our precedent upholding the constitutionality of Article 45(b).[21] *See Cardenas*, 80 M.J. at 423 (stating that "we are not bound by precedent when there is a significant change in circumstances"); *cf. United States v. Allbery*, 44 M.J. 226, 228 (C.A.A.F. 1996) (noting that "an intervening decision of . . . the Supreme Court of the United States" would authorize a lower court to depart from this Court's precedent).

In *McCoy*, "the defendant vociferously insisted that he did not engage in the charged acts and adamantly objected

---

[21] Laying the groundwork for his "right of autonomy" argument under *McCoy*, Appellant also argues that the Supreme Court's opinion in *Faretta*, 422 U.S. 806, was "anchored in 'the fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty.'" Appellant's Brief at 92 (quoting *Weaver*, 137 S. Ct. at 1907). He further argues that courts have applied *Faretta* "beyond self-representation to both restrict the imposition of pleas on unwilling defendants and uphold pleas that were freely requested." *Id.* Be that as it may, we do not read *Faretta* or its progeny as being so broad as to disturb our long-established precedent that upholds the constitutionality of Article 45(b).

to any admission of guilt." 138 S. Ct. at 1505. However, "the trial court permitted counsel, at the guilt phase of a capital trial, to tell the jury the defendant 'committed three murders. . . . [H]e's guilty.'" *Id.* (alterations in original). The Supreme Court held "that a defendant has the right to insist that counsel refrain from admitting guilt." *Id.* The Court explained that "it is the defendant's prerogative, not counsel's, to decide on the objective of his defense: to admit guilt in the hope of gaining mercy at the sentencing stage, or to maintain his innocence, leaving it to the State to prove his guilt beyond a reasonable doubt." *Id.*

Despite this seemingly expansive language highlighted by Appellant, many federal courts interpreting and applying the *McCoy* holding have limited it to the narrow set of circumstances presented in that case. *See, e.g.*, *Kellogg-Roe v. Gerry*, 19 F.4th 21, 28 (1st Cir. 2021) (declining to extend *McCoy* beyond the facts of that case); *United States v. Rosemond*, 958 F.3d 111, 123 (2d Cir. 2020) ("[W]e read *McCoy* as limited to a defendant preventing his attorney from admitting he is guilty of the crime with which he is charged."); *see also Roof*, 10 F.4th at 353 (approvingly citing the prior-quoted language from *Rosemond*).

Moreover, the language in *McCoy* suggesting that the decision of "whether to plead guilty"—when pleading guilty is a possibility—is "reserved for the client," is dicta. 138 S. Ct. at 1508. The actual holding of *McCoy* is that "it is unconstitutional to allow defense counsel to *concede guilt* over the defendant's intransigent and unambiguous objection." *Id.* at 1507 (emphasis added). That circumstance did not occur in the instant case. Further, McCoy was allowed to enter the plea of his choice—not guilty—and the harm came from his counsel's admissions—purportedly on McCoy's behalf—that were *inconsistent with that plea. Id.* at 1506–07. Again, that circumstance did not arise in the instant case. Further still, *McCoy* concerned the prerogative of an *attorney* to determine the scope of appropriate objectives of representation by unilaterally deciding whether a guilty plea should be entered on a client's behalf. But the issue

here concerns whether *Congress* has the power to decide whether an accused may enter a guilty plea.

Additionally, the Supreme Court's concerns in *McCoy* were of a different nature than the concerns expressed by Appellant in the instant case. Stated differently, the interests implicated by a counsel telling a jury that the accused is guilty against the accused's wishes is simply of a different kind than the interests implicated by Congress refusing to allow an accused servicemember to plead guilty to a certain subset of offenses. The Supreme Court recognized that an accused in McCoy's position "may wish to avoid, above all else, the opprobrium that comes with admitting he killed family members. Or he may hold life in prison not worth living and prefer to risk death for any hope, however small, of exoneration." *Id.* at 1508. In Appellant's case, neither of these interests is present because Appellant *wanted* to plead guilty. Regardless, this is a policy consideration for Congress to consider, not a constitutional or legal issue for this Court to decide.

In analyzing this issue, perhaps the most important point is that the Constitution expressly grants Congress power over the military justice system. Article I, § 8, cl. 14 states: "The Congress shall have the power . . . [t]o make Rules for the Government and Regulation of the land and naval Forces . . . ." *See Chappell v. Wallace*, 462 U.S. 296, 301 (1983) ("It is clear that the Constitution contemplated that the Legislative Branch [would] have plenary control over . . . regulations, procedures and remedies related to military discipline . . . ."). And as we have repeatedly held, Congress legislated within the confines of this constitutional grant of authority when it enacted Article 45, UCMJ.

The intent of Congress in enacting Article 45 is apparent; it sought to protect the interests of accused servicemembers, not circumscribe them. *See United States v. Chancelor*, 16 C.M.A. 297, 299, 36 C.M.R. 453, 455 (1966) ("During the hearings on the Uniform Code of Military Justice, there was considerable concern expressed regarding the entry of guilty pleas in courts-martial, and Congress made clear the nature of the safeguards which they

intended to surround the receiving of such a judicial confession."). This Court has long observed that Congress could decide that "[t]he 'unique circumstances of military service require[] specific statutory protections for members of the armed forces'" due to "the subtle and not so subtle pressures that apply to military life and might cause members of the armed forces to feel compelled to" relinquish their constitutional rights. *United States v. Gilbreath*, 74 M.J. 11, 16-17 (C.A.A.F. 2014) (second alteration in original) (discussing Article 31(b), UCMJ, 10 U.S.C. § 831(b) (2012)) (quoting *United States v. Swift*, 53 M.J. 439, 445 (C.A.A.F. 2000)). Thus, Congress was exercising its constitutional authority to make rules for the armed forces when it prohibited guilty pleas in capital cases under Article 45(b), UCMJ.

Moreover, as the Supreme Court itself has clearly stated, "[t]here is, of course, no absolute right to have a guilty plea accepted," nor, more generally, to enter any guilty plea that a defendant might wish to enter. *Santobello v. New York*, 404 U.S. 257, 262 (1971); *United States v. McCrimmon*, 60 M.J. 145, 152 (C.A.A.F. 2004) ("An accused does not have a constitutional right to plead guilty[,] . . . . [a]s the Constitution guarantees only a right to plead not guilty . . . ."). Rather, the sovereign is free to delineate when and under which circumstances certain pleas may be entered. *See North Carolina v. Alford*, 400 U.S. 25, 38 n.11 (1970) ("A criminal defendant does not have an absolute right under the Constitution to have his guilty plea accepted by the court, although the States may by statute or otherwise confer such a right. Likewise, the States may bar their courts from accepting guilty pleas from any defendants who assert their innocence." (citation omitted)).

In this case, Appellant was merely compelled by Congress to have the Government prove his guilt beyond a reasonable doubt. This was not a violation of his Sixth Amendment rights—particularly when any detriment to Appellant would have been allayed by the military judge's offer to instruct the panel members during sentencing that

Appellant had sought to plead guilty during findings but was prohibited from doing so by operation of law. In sum, considering the long history of the legislative regulation of the entry of pleas, Congress's authority under the Constitution to regulate military justice, and the Supreme Court's Sixth Amendment precedent, the dicta in *McCoy* cannot be read as suggesting that there is a constitutional right to plead guilty. *See Weiss*, 510 U.S. at 177 (stressing that judicial deference " 'is at its apogee' when reviewing congressional decisionmaking" concerning regulations and procedures related to military justice (quoting *Rostker v. Goldberg,* 453 U.S. 57, 70 (1981))). Therefore, Appellant's argument that *McCoy* requires us to overrule our precedents that have consistently upheld Article 45(b)'s prohibition against guilty pleas for capital offenses is without merit.

### III. Issue V: Statutory Challenge to Article 45(b), UCMJ

In the alternative, Appellant contends that by prohibiting his proffered guilty pleas to *non*capital offenses, the military judge "caused the wholesale deprivation of [A]ppellant's regulatory right to plead guilty to these noncapital offenses[,] . . . result[ing] in structural error." Appellant's Brief at 101. Specifically, he advocates for overruling our predecessor court's decision in *Dock*, 28 M.J. 117, to the extent that it prohibits, under certain circumstances, a capital accused from pleading guilty to noncapital offenses. Appellant notes that the military judge relied on *Dock* to reject Appellant's offer to plead guilty to unpremeditated murder, as well as to either attempted premeditated murder or attempted unpremeditated murder.

In *Dock*, this Court's predecessor interpreted Article 45(b) to mean that " 'it is not just the pleas that are looked to but the four corners of the record to see if, for all practical purposes, the accused pled guilty to a capital offense.' " 28 M.J. at 119 (alteration in original removed) (internal quotation marks omitted) (first quoting *United States v. Dock*, 26 M.J. 620, 623 (A.C.M.R. 1988) (en banc); and then citing *United States v. McFarlane*, 8 C.M.A. 96, 100, 23 C.M.R. 320, 324 (1957)). In *Dock*, because the "appellant's pleas,

*taken within the context of th*[e] *case*, constituted a plea of guilty to . . . a capital offense," those pleas "were taken in violation of Article 45(b), . . . and should have been rejected as required by Article 45(a), UCMJ." *Id.* (second alteration in original) (emphasis added) (internal quotation marks omitted) (quoting *Dock*, 26 M.J. at 623).

## A. Standards of Review

"This Court reviews matters of statutory interpretation[, such as the interpretation of Article 45,] de novo." *United States v. Hiser*, 82 M.J. 60, 64 (C.A.A.F. 2022). Deviation from the requirements of Article 45(b) is reviewed for harmless error. *See Matthews*, 16 M.J. at 363 (finding "no prejudice to appellant from the judge's refusal to accept a plea of guilty to this crime"). And this Court reviews whether there is harmless error de novo. *United States v. Bowen*, 76 M.J. 83, 87 (C.A.A.F. 2017). Finally, this Court has the discretion to overrule its own precedent. *United States v. Blanks*, 77 M.J. 239, 242 (C.A.A.F. 2018) (although "adherence to precedent is the preferred course," stare decisis "is not an inexorable command" (citations omitted) (internal quotation marks omitted)).

## B. Applicable Law

As discussed above, at the time of Appellant's court-martial Article 45(b), UCMJ, provided, in relevant part, that "[a] plea of guilty by the accused may not be received to any charge or specification alleging an offense for which the death penalty may be adjudged." The analogous Rule for Court-Martial, R.C.M. 910(a)(1) (2008 ed.), contained nearly identical language: "A plea of guilty may not be received as to an offense for which the death penalty may be adjudged by the court-martial."

In *non*capital cases, however—both at the time of Appellant's court-martial and up until the present day—R.C.M. 910 *has* generally permitted an accused to plead "not guilty to an offense as charged, but guilty of a lesser included offense." R.C.M. 910(a)(1) (2008 ed.); *see also* R.C.M. 910(a)(1)(B) (2019 ed.). The rule's discussion then goes on to state: "A plea of guilty to a lesser included offense

does not bar the prosecution from proceeding on the offense as charged." R.C.M. 910(a)(1) Discussion (2008 ed.). When a guilty plea has been made and accepted, "a finding of guilty of the charge or specification may . . . be entered immediately without vote," and "[t]his finding shall constitute the finding of the court." Article 45(b), UCMJ. It is this regulatory right to which Appellant cites when arguing that the military judge erred by preventing him from pleading guilty to *non*capital offenses, resulting in structural error.

Under the doctrine of horizontal stare decisis, "an appellate court must adhere to its own prior decisions, unless it finds compelling reasons to overrule itself." *United States v. Andrews*, 77 M.J. 393, 399 (C.A.A.F. 2018) (alteration in original removed) (internal quotation marks omitted) (quoting *United States v. Quick*, 74 M.J. 332, 343 (C.A.A.F. 2015) (Stucky, J., joined by Ohlson, J., dissenting)). However, "[a]pplying stare decisis is not an inexorable command, and we are not bound by precedent when there is a significant change in circumstances after the adoption of a legal rule, or an error in legal analysis." *Cardenas*, 80 M.J. at 423. "Stare decisis is most compelling where courts undertake statutory construction as is the case here." *Blanks*, 77 M.J. at 242 (internal quotations marks omitted).

To determine whether to depart from stare decisis, this Court applies the following factors: "whether the prior decision is unworkable or poorly reasoned; any intervening events; the reasonable expectations of servicemembers; and the risk of undermining public confidence in the law." *Id.* (citation omitted) (internal quotation marks omitted). "The party requesting that we overturn precedent bears a substantial burden of persuasion." *Andrews*, 77 M.J. at 399 (citation omitted) (internal quotation marks omitted). In addition, a "party must present a 'special justification' for us to overrule prior precedent." *Blanks*, 77 M.J. at 242 (quoting *Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 456 (2015)).

### C. Discussion

On its face, *Dock* controls the disposition of the instant issue and Appellant has not met his burden of persuading us that *Dock* should be overturned. First, although reasonable minds could differ about whether *Dock* was poorly reasoned, and although there is little case law that demonstrates military courts' application of *Dock*,[22] its holding is not unworkable. Indeed, the military judge's analysis in Appellant's case exemplifies this point. She applied *Dock* without difficulty and persuasively reasoned that if Appellant were permitted to plead guilty to unpremeditated murder and attempted premeditated murder, under the facts of this case, "[i]t would be possible for [Appellant] to be convicted of the charged capital offense without presenting any additional evidence." Similarly, the military judge readily identified that accepting pleas of guilty from Appellant to unpremeditated murder and attempted unpremeditated murder where "the factual predicate in this particular case [was] the killing of 13 people over a period of time . . . would be the factual equivalent to pleading guilty to a capital offense in violation of Article 45 of the [UCMJ]."

Appellant complains that "[a]t the time of a guilty plea, the record's 'four corners' have not yet been developed." Appellant's Brief at 113. However, this point is of little concern. Article 45(a) states in pertinent part, "[i]f an accused . . . after a plea of guilty sets up matter inconsistent with the plea, . . . a plea of not guilty shall be entered in the

---

[22] In *United States v. Simoy*, 46 M.J. 592, 620 (A.F. Ct. Crim. App. 1996), *rev'd in part on other grounds* 50 M.J. 1 (C.A.A.F. 1998), the United States Air Force Court of Criminal Appeals found that the military judge did not abuse his discretion by applying *Dock* to prohibit the appellant's pleas of guilty to conspiracy to commit robbery, attempted murder, and armed robbery in a capital felony murder case due to the "substantial risk" that Article 45(b) might be violated. However, as Appellant highlights, at trial in this case the Government argued that *Simoy* is "an anomaly in Article 45(b) jurisprudence and has little precedential value." Reply Brief at 51 (internal quotation marks omitted).

record, and the court shall proceed as though he had pleaded not guilty." In essence, military judges have a duty to correct a guilty plea, so they are obligated to correct guilty pleas entered in contravention of Article 45(b). Appellant also complains that an accused would have no recourse "if, after the record develops, there is no *de facto* plea." Appellant's Brief at 113. However, an accused in that position would have appellate recourse.

Second, we reject Appellant's argument that our precedent in *Dock* should be overturned because *McCoy*'s purported constitutional right of autonomy to concede guilt at trial constitutes an "intervening event." As we have explained, the holding of *McCoy* dealt with a different problem than the one allegedly present in this case—that of *counsel* overriding a criminal defendant's choice to plead not guilty as opposed to the *sovereign's* ability to compel a criminal defendant to plead not guilty. 138 S. Ct. at 1505. Therefore, *McCoy* does not serve as an intervening event that would undermine *Dock*.

Third, it is unclear whether the expectations of servicemembers would be undermined if we were to overrule *Dock*. *Cf. Quick*, 74 M.J. at 337 (noting in the context of the authority of Courts of Criminal Appeals to order sentence-only rehearings that "it is difficult to quantify the expectations of servicemembers"). However, servicemembers theoretically have relied on this Court's Article 45(b) de facto guilty plea precedents, like *Dock*, to protect their right to not be induced into pleading guilty in capital cases, as this right "has become an established component of the military justice system." *Id.*

Fourth, contrary to Appellant's contention, we believe that departing from *Dock* would undermine the public's confidence in the law. *Dock* has been binding precedent of this Court for thirty-four years, and in turn, it is based on a sixty-five-year precedent—*McFarlane*. This Court has observed that: "Just as overturning precedent can undermine confidence in the military justice system, upholding precedent tends to bolster [the public's] confidence in the law." *Andrews*, 77 M.J. at 401.

51

Also, the Supreme Court has recognized that "long congressional acquiescence . . . enhance[s] even the usual precedential force we accord to our interpretations of statutes." *Watson v. United States*, 552 U.S. 74, 82-83 (2007) (citation omitted) (internal quotation marks omitted). For many years, Congress did not disturb *Dock*'s de facto guilty plea interpretation of Article 45(b). Although Congress recently amended Article 45(b), it did so only for cases referred to courts-martial on or after January 1, 2019. National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, § 5542(a), (c)(2), 130 Stat. 2000, 2967-68 (2016). That the legislative body with the constitutional power to make rules for the armed forces chose to not retroactively apply that amendment to Article 45(b) is a factor that members of the public would consider in assessing their confidence in the law. *See Middendorf*, 425 U.S. at 43 ("we must give particular deference to the determination of Congress, made under its authority to regulate the land and naval forces").

Thus, these factors weigh against overruling *Dock*. However, even if we were to hold that *Dock* was wrongly decided and that Article 45(b)'s prohibition against an accused pleading guilty to a lesser included offense is contrary to the plain language of Article 45(b), UCMJ, Appellant is entitled to no relief because he suffered no prejudice under either the harmlessness standard or the harmlessness beyond a reasonable doubt standard.[23] Indeed,

---

[23] Appellant argues that if *Dock* was wrongly decided, the military judge's error in refusing to take Appellant's guilty pleas to lesser included offenses was structural error because the military judge's refusal infringed on his protected autonomy interests recognized in *McCoy*. However, as discussed above, we have determined that *McCoy* does not disturb *Dock*. Also, structural errors "affect the entire conduct of the [proceeding] from beginning to end" while "discrete defects in the criminal process . . . are not structural because they do not *necessarily* render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." *Greer v. United States*, 141 S. Ct. 2090, 2100 (2021) (first alteration in original) (citations omitted) (internal quotation marks omitted).

application of a prejudice analysis results in an unequivocal result: Appellant was not prejudiced by the military judge's application of Article 45(b).

With regard to findings, even if the military judge should have allowed Appellant to plead guilty to the lesser included offenses, Appellant could not have been prejudiced by this alleged error because the only result was that Appellant's guilt was subjected to adversarial testing. And through that testing, Appellant was found guilty.

With regard to sentencing, although we recognize in a capital case an accused may benefit from pleading guilty as part of a concerted effort to accept responsibility and to demonstrate contrition for his or her heinous criminal conduct, that scenario simply does not apply here. Appellant demonstrated no remorse during his opening statement and did not put on a sentencing case or give a sentencing argument. And importantly, he went so far as to affirmatively reject the military judge's offer to instruct the panel members that he attempted to plead guilty but was not permitted to do so by operation of law. Under these circumstances, we conclude that even if the military judge's application of *Dock* constituted error, Appellant experienced no prejudice.

---

Consistent with these definitions, prohibiting an accused from pleading guilty is not a structural error. Furthermore, the Supreme Court has stated that "[o]nly in a 'very limited class of cases' has the Court concluded that an error is structural, and 'thus subject to automatic reversal' on appeal." *Id.* at 2099-2100 (quoting *Neder*, 527 U. S. at 8). And in *Matthews*, 16 M.J. at 363, a case that predated *Dock*, this Court's predecessor applied a prejudice analysis to a military judge's refusal to accept a plea to premeditated murder and rape in a capital case, thereby demonstrating in an analogous situation, that we have not considered the prohibition of a guilty plea to a capital offense to constitute structural error.

### Issue VI: Whether the Prosecutor's Sentencing Argument Impermissibly Invited the Panel to Make its Determination on Caprice and Emotion[24]

Appellant asserts that the trial counsel engaged in prosecutorial misconduct during his sentencing argument. Specifically, Appellant cites the trial counsel's reference to a victim's pregnancy at the time of the shooting, his purported appeal to the members' emotions, and his use of first-person plural pronouns while addressing the members. For the reasons provided below, we conclude that Appellant is not entitled to the new sentencing hearing which he seeks.

### I. Background

Over Appellant's objection at trial, the military judge admitted evidence that Private E-2 (PV2) FV, one of the soldiers whom Appellant had killed, was pregnant at the time of the offense.[25] Specifically, in order to establish that Appellant acted with premeditation when he killed her, the Government offered evidence that Appellant shot PV2 FV after she screamed "My baby! My baby!"[26] The military judge ruled that PV2 FV's shouts of "My baby!" were admissible as res gestae evidence.[27] In the course of doing

---

[24] This issue was not raised before the ACCA.

[25] The Government did not charge Appellant with the unborn child's death.

[26] In essence, the trial counsel's argument was as follows: PV2 FV's pleas of "My baby! My baby!" were intended to communicate, "Don't shoot me. I'm pregnant." The fact that Appellant shot PV2 FV after this plea showed that the act was premeditated.

[27] Res gestae is defined as "[t]he events at issue, or other events contemporaneous with them." *Black's Law Dictionary* 1565 (11th ed. 2019). This Court has explained, "Res gestae evidence is vitally important in many trials. It enables the factfinder to see the full picture so that the evidence will not be confusing and prevents gaps in a narrative of occurrences which might induce unwarranted speculation." *United States v. Metz*, 34 M.J. 349, 351 (C.M.A. 1992) (footnote omitted) (citation omitted).

so, she conducted a Military Rule of Evidence 403 balancing test.

In its opening statement, the Government drew attention to PV2 FV's screams of "My baby, my baby." Likewise, during the merits phase of the trial, various witnesses of the shooting testified that they heard her shouts. PV2 FV's supervisor and a medical examiner also testified, and they confirmed that PV2 FV was pregnant at the time of the attack.

After Appellant was convicted, PV2 FV's father was called as a witness during the Government's sentencing case. He testified in relevant part: "That man did not just kill 13 [people]—he killed 15. He killed my [unborn] grandson, and he killed me, slowly." Additionally, the Government placed PV2 FV's pregnancy into evidence at sentencing by recalling her supervisor to testify to his efforts to keep her in Iraq, where she had been deployed, after learning of her pregnancy.

During the Government's sentencing argument, trial counsel summarized the lives of the victims Appellant killed, how they died, and their loved ones' discovery of their deaths. In this context, trial counsel said the following about PV2 FV:

> [PV2 FV] —a mother's thoughts [sic] not for herself, not for her own life, but for that of her unborn child. [PV2 FV], 21, whose final words were, "My baby! My baby!" A single bullet punctured her lungs and her heart; a single bullet ended her life, and that of her unborn child, and broke her father's heart.

> Death is fickle. A single bullet—two lives lost, and a father's changed forever.

Trial counsel later emphasized, "[Appellant] ignored pleas for help, cries of terror, *the cries of a mother*." (Emphasis added.)

Counsel concluded the Government's sentencing argument as follows:

> For his crimes, he should forfeit his life.

> There is a price to be paid for the mass murder he perpetrated on 5 November. There is a price to be paid for what he did, for the lives he took, the lives he horrifically changed, and the pain and sorrow he wrought.
>
> You should, however, have mercy in your sentence. It should speak to the 13 souls *who have departed our formation*. You should *reserve your emotion for their souls*, and your compassion for their families, and your mercy for their memory.
>
> For the accused, he should be given an accounting; he should be given a reckoning—a reckoning for his crimes, and for his crimes, he should pay a price.
>
> . . . He will never be a martyr because he has nothing to give.
>
> Do not be misled. Do not be confused. Do not be fooled. He is not giving his life. *We are taking his life.* This is not his gift to God; this is his debt to society. This is not a charitable act; this is the cost of his murderous rampage. He will not now, and he never will be, a martyr. He is a criminal. He is a cold-blooded murderer. On 5 November, he did not leave this earth; he remained to pay a price. He remained to pay a debt—the debt he owes is his life.

(Emphasis added.)

At no time did Appellant object to the Government's sentencing argument, and he did not present a sentencing case or argument of his own.

Subsequently, the military judge instructed the members that Appellant "is to be sentenced only for the offenses of which he has been found guilty." She later added, "You are advised that the arguments of the trial counsel, and his recommendations, are only his individual suggestions, and may not be considered as the recommendation or opinion of anyone other than such counsel." The military judge continued:

> You also heard testimony from the father of one of the victims that he and his unborn grandchild

were victims of the accused's crimes. You may
only consider this as evidence of the emotional im-
pact on the victim's family. You must bear in mind
that the accused is to be sentenced only for the of-
fenses of which he has been found guilty.

Appellant now argues that "[t]he gratuitous and *re-
peated* references to a victim's pregnancy" as well as "the
specific call to the panel to use their *emotion* for those who
have left 'our formation'" amounted to improper argument
and constituted plain error. Appellant's Brief at 117. Ap-
pellant also argues that the trial evidence of PV2 FV's preg-
nancy was unnecessary for its professed purpose—to prove
premeditation—and that most such references were irrele-
vant. He alleges that "the government repeatedly put her
pregnancy in evidence in a calculated and impermissible
effort to emotionally charge the panel," so that trial counsel
could "circle[] back during sentencing to" argue a "'single
bullet—two lives lost.'" *Id.* at 126.

In response, the Government argues that "trial counsel
fairly and appropriately argued the aggravating factors
from evidence adduced at trial." Appellee's Brief at 94. Spe-
cifically, the Government contends that it was fair and ac-
curate commentary for trial counsel to note during sentenc-
ing argument that Appellant had killed a pregnant woman
and her unborn child. Furthermore, the Government as-
serts that the trial counsel did not "impermissibly invite
the panel to impose the death penalty based on sheer emo-
tion," and that it was not erroneous for the trial counsel to
use first-person personal pronouns in the context which he
did. *Id.* at 99.

In the alternative, the Government asserts that if any
of the trial counsel's sentencing arguments constituted er-
ror, those errors were harmless. In support of this position,
the Government contends that the severity of any miscon-
duct was minimal, the military judge's sentencing instruc-
tions cured any error, and "the egregiousness of Appellant's
crimes and the great weight of the evidence supporting
[his] sentence demonstrate that any error in the sentencing
argument was not prejudicial." *Id.* at 105. Thus, the

Government argues, even "if this Court finds error, it should still be confident that Appellant was sentenced on the basis of the evidence alone." *Id.* at 94.

## II. Standard of Review

When an appellant challenges trial counsel's sentencing argument for the first time on appeal, this Court reviews for plain error. *United States v. Norwood*, 81 M.J. 12, 19 (C.A.A.F. 2021). Under this standard of review, an appellant ordinarily bears the burden not only of establishing that there is error and that the error is clear or obvious, but also that the error materially prejudices a substantial right. *Id.* at 19-20. However, in those instances where a clear or obvious error rises to the level of a constitutional violation, the burden shifts to the government to "show that the error was harmless beyond a reasonable doubt." *Tovarchavez*, 78 M.J. at 462 n.6.

## III. Applicable Law

Under this Court's precedent:

> Prosecutorial misconduct occurs when trial counsel overstep[s] the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense. Prosecutorial misconduct can be generally defined as action or inaction by a prosecutor in violation of some legal norm or standard, *e.g.*, a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon.

*United States v. Hornback*, 73 M.J. 155, 159-60 (C.A.A.F. 2014) (alteration in original) (citations omitted) (internal quotation marks omitted). "During sentencing argument, 'the trial counsel is at liberty to strike hard, but not foul, blows.'" *United States v. Halpin*, 71 M.J. 477, 479 (C.A.A.F. 2013) (quoting *United States v. Baer*, 53 M.J. 235, 237 (C.A.A.F. 2000)). Trial counsel may "argue the evidence of record, as well as all reasonable inferences fairly derived from such evidence," but "may not . . . inject his personal opinion into the panel's deliberations, inflame the members' passions or prejudices, or ask them to convict the accused on the basis of criminal predisposition." *United*

*States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017) (citations omitted) (internal quotation marks omitted).

Trial counsel's argument must be " 'viewed in context' " because "it is improper to 'surgically carve' out a portion of the argument with no regard to its context." *Baer*, 53 M.J. at 238 (citations omitted); *see also id.* (" 'If every remark made by counsel outside of the testimony were ground for a reversal, comparatively few verdicts would stand, since in the ardor of advocacy, and in the excitement of trial, even the most experienced counsel are occasionally carried away by this temptation.' " (quoting *Dunlop v. United States*, 165 U.S. 486, 498 (1897))).

In capital cases, "[t]he penalty phase . . . is undertaken to assess the gravity of a particular offense and to determine whether it warrants the ultimate punishment." *Monge v. California*, 524 U.S. 721, 731-32 (1998). The Supreme Court has long recognized that "capital sentencing must be reliable, accurate, and nonarbitrary." *Saffle v. Parks*, 494 U.S. 484, 493 (1990). In this regard, " '[i]t is of vital importance' that the decisions made in that context 'be, and appear to be, based on reason rather than caprice or emotion.' " *Monge*, 524 U.S. at 732 (quoting *Gardner v. Florida*, 430 U.S. 349, 358 (1977)).

"In the plain error context, we determine whether the cumulative effect of an improper sentencing argument impacted 'the accused's substantial rights and the fairness and integrity of his trial.' " *Akbar,* 74 M.J. at 394 (quoting *Halpin*, 71 M.J. at 480). To perform this inquiry, we "examine[] 'whether trial counsel's comments, taken as a whole, were so damaging that we cannot be confident that the appellant was sentenced on the basis of the evidence alone.' " *Id.* (quoting *Halpin*, 71 M.J. at 480). In assessing prejudice for improper sentencing argument, this Court "balance[s (1)] the severity of the improper argument, [(2)] any measures by the military judge to cure the improper argument, and [(3)] the evidence supporting the sentence." *United States v. Marsh*, 70 M.J. 101, 107 (C.A.A.F. 2011) (citing *United States v. Erickson*, 65 M.J. 221, 224 (C.A.A.F. 2007)). This Court has "reiterat[ed] that

in cases of improper argument, each case must rest on its own peculiar facts." *Baer*, 53 M.J. at 239.

## IV. Discussion

As an initial matter, we reject Appellant's contention that the military judge erred by admitting into evidence the fact that PV2 FV was pregnant and that she shouted "My baby! My baby!" The evidence of PV2 FV's pregnancy and her screams was properly admitted as res gestae.[28] The witnesses of the shooting who testified they heard PV2 FV's shouts were merely relaying to the members their observations. The only potentially problematic witnesses were PV2 FV's supervisor who testified as to her reason for redeployment, and the medical examiner who confirmed her pregnancy. However, the supervisor's testimony was relevant for the purpose of explaining why PV2 FV was at the Soldier Readiness Processing center on November 5, and the medical examiner's testimony merely confirmed what the members had already heard—that PV2 FV was pregnant.

Moreover, regardless of the merits of admitting this evidence during findings, in the context of the issue presented we note that PV2 FV's pregnancy was relevant for sentencing as evidence in aggravation. R.C.M. 1001(b)(4) (2008 ed.) states in part: "Evidence in aggravation includes, but is not limited to, evidence of financial, social, psychological, and medical impact on or cost to any person or entity who was the victim of an offense committed by the accused."[29] And "it is appropriate for trial counsel 'to argue the evidence of record, as well as all reasonable inferences fairly

---

[28] We acknowledge that the alternative rationale provided by the Government for why this evidence was admissible seems to be a closer call, but there is an insufficient basis for us to conclude that the military judge abused her discretion by admitting this evidence for "the limited purpose of its relevance, if any, to premeditation and the intent to kill."

[29] R.C.M. 1004(b) (2008 ed.) provides that "the provisions [of] R.C.M. 1001" apply to capital cases.

derived from such evidence.' " *Sewell*, 76 M.J. at 18 (quoting *Baer*, 53 M.J. at 237).

Appellant contends that trial counsel's "multitude [of] references to PV2 FV's pregnancy" was "a calculated and impermissible effort to emotionally charge the panel" and constituted prosecutorial misconduct in sentencing argument. Appellant's Brief at 126. However, "[v]ictim impact testimony is admissible in capital cases to inform the panel about 'the specific harm caused by [the accused].' " *Akbar*, 74 M.J. at 393 (second alteration in original) (quoting *Payne v. Tennessee*, 501 U.S. 808, 825 (1991)). And the death of her unborn child was "directly relat[ed] to or result[ed] from" the offense of PV2 FV's killing, of which Appellant was convicted. R.C.M. 1001(b)(4) (2008 ed.).

Additionally, Appellant's claim that "the members were led to believe there was an unnamed, fourteenth victim on the charge sheet," is unpersuasive. Appellant's Brief at 126. As a general matter, the military judge instructed the panel that Appellant was "to be sentenced only for the offenses of which he has been found guilty," and there was no "fourteenth victim" whom Appellant was found guilty of killing. Moreover, the members were explicitly instructed by the military judge that, despite the testimony of PV2 FV's father that "he and his unborn grandchild were victims" of Appellant's crimes, the members could "only consider this as evidence of the emotional impact on the victim's family . . . . [And were required to] bear in mind that the accused is to be sentenced only for the offenses of which he has been found guilty." Absent evidence to the contrary, we presume the members understood and followed the military judge's instructions on this issue. *See United States v. Piolunek*, 74 M.J. 107, 111 (C.A.A.F. 2015). For these reasons, trial counsel did not commit misconduct by referencing PV2 FV's pregnancy during his sentencing argument.

Appellant also contends that it was error for the trial counsel to argue: "You should reserve your emotion for [the victims'] souls, and your compassion for their families, and your mercy for their memory." Appellant asserts that this was an improper appeal to emotion that is impermissible

during sentencing. Although it is true that the trial counsel used the term "emotion" during this portion of his sentencing argument, it cannot be said that he improperly urged the panel members to use their emotions when devising a proper sentence for Appellant. To the contrary, the trial counsel urged the panel members to "*reserve*" their emotions for other purposes, and he grounded his overall sentencing argument on the following proposition: "[M]embers of the panel, because of what [Appellant] did, because of who he did it to, because of where he did it, and because of when he did it, the just and appropriate sentence in this case is death." (Emphasis added.) Stated differently, the trial counsel asked the panel members to sentence Appellant "for his crimes." Thus, in its totality, this line of argument was appropriate.[30]

Finally, we will assume without deciding for purposes of this appeal that trial counsel's use of first-person plural pronouns ("our" and "we") were improper when he referred to Appellant's victims as those "who have departed *our* formation" and when he stated "*we* are taking his life." (Emphasis added.) *See People v. Wheeler*, 871 N.E.2d 728, 748 (Ill. 2007) ("[I]t is improper for a prosecutor to utilize closing argument to forge an 'us-versus-them' mentality that is inconsistent with the criminal trial principle that a jury fulfills a nonpartisan role . . . .").

Turning to the issue of prejudice, we will assume without deciding that—because this was a capital case—the trial counsel's improper arguments were of a constitutional

---

[30] Appellant also argues that the context of the Government's sentencing argument included "heavy undertones of war." Appellant's Brief at 129. However, we agree with the Government that it was Appellant who set this tone in his opening statement, making such remarks as, "And the dead bodies will testify that war is an ugly thing," and "[t]he evidence will show . . . that I was on the wrong side [of] America's war on Islam. But then I switched sides." Under these circumstances, to the extent the Government's sentencing argument contained "undertones of war," we find such commentary was not impermissible within the context of the entire proceedings.

dimension.[31] As a consequence, the Government has the burden of proving "the error was harmless beyond a reasonable doubt . . . on plain error review." *United States v. Palacios Cueto*, 82 M.J. 323, 334 (C.A.A.F. 2022).

For the following reasons, we conclude that the Government has met this burden. First, the record before us demonstrates that this improper argument was isolated, and it was not severe. *See Norwood*, 81 M.J. at 20 (finding no severe conduct where the improper argument "only made up a few lines of [the] rebuttal argument"). Second, although the military judge did not take any measures to cure these fleeting improper comments, the evidence properly before the panel members included many aggravating circumstances such as Appellant's murder of thirteen active duty or retired soldiers, his attempted murder of thirty-two other people (many of whom were grievously wounded), and the violation of the oaths he had taken as both an Army officer and a physician. *See Akbar*, 74 M.J. at 394. This evidence in aggravation was particularly damaging to Appellant's case in light of the fact that he offered no evidence in extenuation or mitigation, and he delivered no sentencing argument to the panel members.

Because of the relevant law and the facts of this case, we conclude that Appellant is not entitled to a new sentencing hearing.

### Issue VII: Whether the Continued Forcible Shaving of Appellant Is Punishment in Excess of the Sentence He Received at His Court-Martial and Violated Article 55 and the Eighth Amendment

Appellant identifies as "a devout Muslim who earnestly believes that the wearing of a beard is an important tenet of his faith." Appellant's Brief at 130. Appellant asserts in his briefs that he was forcibly shaved before and after trial

---

[31] As Appellant emphasizes in his brief, "Some courts have tested improper arguments in capital cases for constitutional error because such error implicates an accused's Eighth Amendment right to a reliable death judgment." Appellant's Brief at 124 (citing *Duckett v. Mullin*, 306 F.3d 982, 992 (10th Cir. 2002)).

and that he was punished by personnel at the U.S. Disciplinary Barracks (USDB) for defying orders to shave. According to Appellant, these alleged forcible shavings violated Article 55, UCMJ,[32] and the Eighth Amendment of the Constitution which prohibit the infliction of cruel and unusual punishment, violated the prohibition against imposing punishment in excess of that adjudged at trial, and violated the Religious Freedom Restoration Act (RFRA),[33] which prohibits the government from "imping[ing] on the free exercise of religion without having a compelling governmental interest in doing so." *Id.* at 130. We are not persuaded.

## I. Background

After Appellant's sentence was adjudged on August 28, 2013, he periodically filed requests for exemptions to the grooming standards under the applicable Army regulations on religious grounds. For example, in September of 2013, Appellant asked for an exception to the grooming policy because of his religious beliefs as a practicing Muslim. The Deputy Chief of Staff of the Army denied Appellant's request. In his memorandum to Appellant, Lieutenant General (LTG) Bromberg stated: "Though an inmate, you nonetheless interact with Soldiers who abide by these standards, and who know that you are an officer. Granting you an exception would erode the values, discipline, and team identity that arises from the even-handed application of grooming standards throughout the Army."

In December of 2016, Appellant submitted another request for an exemption from the grooming policy. After meeting with Appellant, a military chaplain wrote in a memorandum-for-record that although there is no religious law requiring Muslim men to wear beards, many Muslim men regard it as an important religious practice. The military chaplain also determined that Appellant's request

---

[32] 10 U.S.C. § 855 (2012).

[33] 42 U.S.C. §§ 2000bb to 2000bb-4 (2012).

appeared to stem from Appellant's "genuine religious belief and personal understanding of his faith." Appellant's request on that occasion was denied—in accordance with the recommendations of Appellant's chain of command—by the Senior Official Performing the Duties of the Assistant Secretary of the Army (Manpower and Reserve Affairs).

As of July 19, 2021, however, Appellant has been allowed to wear a beard in observance of his Islamic faith, but it must be no longer than a quarter inch in length. Appellant claims in his briefs that because he wants to let his beard grow longer than the authorized length in order to follow his sincerely held religious beliefs, he is forcibly shaved every other week. He also claims that every time he is forcibly shaved "he receives further demerits and is denied benefits as a result." Appellant's Brief at 147.

## II. Discussion

Appellant's Article 55 and Eighth Amendment claims fail for the crucial reason that the record before us is devoid of any evidence that Appellant has, in fact, been forcibly shaved. The relevant portion of the record only contains documents related to Appellant's requests for an exception to the Army's grooming policy and the subsequent denials of those requests. Thus, we are forced to rely solely on the appellate defense counsel's bare representations by "information and belief" that Appellant was forcibly shaved. Appellant's Brief at 135, 137. But we note that in prior litigation pertaining to Appellant's desire to grow a beard, we stated the following: "[Appellant's] commander denied his request [to grow his beard] and directed him to comply with the Army's grooming standards, *but took no further action to enforce Appellant's compliance*." *Hasan v. Gross*, 71 M.J. 416, 417 (C.A.A.F. 2012) (emphasis added). We further note that Appellant appeared at a pretrial session with a beard, and the military judge's order to shave was vacated. *Id.* at 419. Therefore, in the instant appeal the defense's failure to document *in the record* that Appellant was forcibly shaved is factually significant and legally consequential.

Moreover, although in their briefs the defense counsel claim by "information and belief" that Appellant was forcibly shaved, they provide no information or description about what these "forcible" shavings allegedly entailed. Thus, even if we were to assume that the alleged forcible shavings did in fact occur, in light of the record before us we have no basis to divine whether the "force" complained of consisted merely of Appellant's involuntary acquiescence to the Army's grooming policy as he unwillingly shaved himself, or whether the alleged incidents of forcible shaving involved some type of physical coercion by USDB personnel. Because the record does not contain this crucial evidence, we find no proper basis to provide relief to Appellant.[34] *See United States v. Ellis*, 47 M.J. 20, 22 (C.A.A.F. 1997) (finding appellant was not entitled to relief as there was "no evidence" to support his claim and this Court had "only the arguments of appellate counsel").

Similarly, Appellant's argument that we should remand this case to the ACCA because the lower court erred in conducting its sentence appropriateness review is unavailing. Courts of Criminal Appeals are empowered to review prison condition claims "if the record contains information about those conditions." *United States v. Willman*, 81 M.J. 355, 358 (C.A.A.F. 2021) (internal quotation marks omitted) (quoting *United States v. Jessie*, 79 M.J. 437, 441 (C.A.A.F. 2020)). And an appellant can properly add material to the record about prison conditions in the course of filing a clemency petition with the convening authority. *See Jessie*, 79 M.J. at 444. But here, Appellant did not present to the convening authority any claim regarding confinement facility policies, despite submitting a 450-page handwritten clemency submission. Therefore, nothing *in the record* before the ACCA raised an issue regarding the purported shavings. Accordingly, the ACCA did not err in

---

[34] For the reasons stated in his concurrence in *United States v. Pullings*, 83 M.J. 205, 214-22 (C.A.A.F. 2023) (Hardy, J., concurring in the judgment), Judge Hardy agrees that Appellant is not entitled to relief on his Article 55 and Eighth Amendment claims.

declining to provide relief to Appellant. *See Willman*, 81 M.J. at 361 ("This Court has never held, or even suggested, that outside-the-record materials considered to resolve an appellant's cruel and unusual punishment [or unlawful increase in sentence] claims became part of the entire record" for sentence appropriateness claims.).

Additionally, Appellant's claim that the denial of his requested exception from the Army's grooming policy unlawfully increased his sentence cannot succeed because the shaving requirement was a "collateral administrative consequence[] of a sentence" rather than "punishment for purposes of the criminal law." *United States v. Guinn*, 81 M.J. 195, 200 n.3 (C.A.A.F. 2021) (internal quotation marks omitted) (quoting *United States v. Pena*, 64 M.J. 259, 265 (C.A.A.F. 2007)). And similar to our analysis above in the context of Article 55 and the Eighth Amendment, Appellant's related claim that being forcibly shaved unlawfully increased his sentence does not merit scrutiny because he has not documented this assertion in the record.

To the extent the record before us does document the rejection of Appellant's requests for a religious accommodation from the Army's beard policy, and to the extent these rejections rise to the level of a RFRA violation, Appellant still is not entitled to relief from this Court. Simply stated, stand-alone RFRA claims and the resulting denial of prison privileges are not justiciable in this Court because our statutory mandate does not extend to the resolution of such matters. *See* Article 67(c), UCMJ (2012) (limiting review "with respect to the findings and sentence" of a court-martial).

To the extent that Appellant seeks to argue that a RFRA violation automatically constitutes an Article 55 and/or Eighth Amendment violation—both of which *are* justiciable in this Court—we note that the analytical frameworks are different. *Compare United States v. Sterling*, 75 M.J. 407, 415 (C.A.A.F. 2016) ("To establish a prima facie RFRA defense, an accused must show by a preponderance of the evidence that the government action (1) substantially burdens (2) a religious belief (3) that [the

accused] sincerely holds."), *and* 42 U.S.C. § 2000bb-1(a) (generally prohibiting the government from "substantially burden[ing] a person's exercise of religion"), *with United States v. Lovett*, 63 M.J. 211, 215 (C.A.A.F. 2006) (stating that for Article 55 or Eighth Amendment claims, an appellant must show "(1) an objectively, sufficiently serious act or omission resulting in the denial of necessities; (2) a culpable state of mind on the part of prison officials amounting to deliberate indifference to [his] health and safety; and (3) that he has exhausted the prisoner-grievance system . . . and that he has petitioned for relief under Article 138, UCMJ" (alteration in original) (footnotes omitted) (internal quotation marks omitted)).

As a result, even if we were to assume that Appellant's rights under RFRA were violated, that fact standing alone does not serve as a sufficient basis to conclude that his Eighth Amendment and Article 55 claims are meritorious. Stated differently, we do not adopt Appellant's apparent argument that the alleged RFRA violation here—the denial of an exception to the Army's grooming policy—was, standing alone, "an objectively, sufficiently serious act or omission resulting in the denial of necessities" that automatically constituted a violation of the Eighth Amendment. *Lovett*, 63 M.J. at 215. As highlighted by the Government in its brief, the defense has pointed to no federal court decision that has predicated an Eighth Amendment violation upon a deprivation of religious liberty. Indeed, as the Ninth Circuit opined, "[A]n institution's obligation under the [E]ighth [A]mendment is at an end if it furnishes sentenced prisoners with adequate food, clothing, shelter, sanitation, medical care, and personal safety." *Hoptowit v. Ray,* 682 F.2d 1237, 1246 (9th Cir. 1982) (first alteration in original) (citation omitted) (internal quotation marks omitted). We also emphasize that Appellant has not demonstrated "a culpable state of mind" from prison officials that amounts to "deliberate indifference" to his health and safety. *Lovett,* 63 M.J. at 215. At bottom, Appellant needed to show more to succeed on this claim on appeal, and he failed to do so.

In sum, in light of the absence of any evidence to support Appellant's assertions that he was forcibly shaved, Appellant is not entitled to relief on his Article 55 and Eighth Amendment claims. Further, in terms of Appellant's argument that the requirement to comply with the Army's grooming policy constituted punishment in excess of his sentence, that claim fails because the shaving requirement was a collateral administrative consequence of Appellant's sentence. And finally, Appellant's stand-alone RFRA claim is not justiciable by this Court because resolving such an issue would extend beyond this Court's statutory mandate.

## Issue VIII: Whether Appellant Was Deprived [of] His Right to Counsel During Post-Trial Processing[35]

Although initially represented by counsel during the clemency process, Appellant ultimately opted to represent himself during post-trial proceedings. He now asserts that he was deprived of his right to counsel during this period. In determining the merits of his claim, we will assume that Appellant's decision to proceed pro se during post-trial clemency proceedings was valid only if he knowingly, voluntarily, and intelligently waived the right to counsel. Upon doing so, we conclude that Appellant's waiver was valid.

### I. Background

After Appellant was convicted of his offenses, the military judge and standby counsel advised Appellant of his post-trial rights. Key among these rights was Appellant's ability to submit matters for the convening authority's consideration when he was deciding whether to approve the findings and sentence.

After his sentence was announced, Appellant stated that he wanted one of his standby counsel, "Lieutenant Colonel [KP]," to represent him during post-trial matters. On January 29, 2015, an Article 39(a), UCMJ, session was held to discuss Appellant's post-trial representation. At that session, Appellant reiterated his desire to have LTC

---

[35] This issue was not raised before the lower court.

KP serve as his post-trial representative. However, in his brief before this Court, Appellant vaguely states that LTC KP subsequently "left the case," and a civilian defense counsel entered an appearance. Appellant's Brief at 148.

The staff judge advocate (SJA) subsequently prepared an SJA recommendation (SJAR) advising the convening authority to approve the adjudged sentence. In response, the civilian defense counsel prepared to submit matters for the convening authority's consideration under R.C.M. 1105 and R.C.M. 1106. However, on February 13, 2017, shortly before his post-trial submissions were due, Appellant presented a handwritten letter to the SJA stating:

> Effective immediately, I <u>Nidal Hasan</u> the accused . . . am representing myself soley [sic] in the matter of the submission of post-trial matters pursuant to Rules for Court-Martial (R.C.M.) 1105 and 1106. In this capacity my only submission to the . . . convening authority . . . is a piece entitled "Mans [sic] Duty to His Creator and the Purpose of Life" . . . . Please don't involve any lawyers for as I have clearly stated above I am representing myself and understand the consequences. . . . The presiding judge (Colonel [Osborn]) allowed me to represent myself during the trial so you should not hesitate to do so now in these post-trial matters.

The SJA responded to the letter by writing Appellant's civilian defense counsel:

> Given that we have yet to receive any formal notice of your release as counsel to the Accused, I forward a copy of the Accused's letter, enclosed, to you and ask that you immediately clarify what matters the Convening Authority should consider before taking Action.
>
> It has now been over a year since matters were originally due in this case. I will advise the Convening Authority to take initial Action. I ask that you provide a response to this office on or before March 2, 2017.

The civilian defense counsel's response is not in the record before us. However, in a reply letter from March 13,

2017, the SJA indicated she had received an email from the civilian defense counsel on March 2. In that reply letter to the civilian defense counsel, the SJA confirmed:

> In accordance with the Accused's and your request, the only post-trial defense matters the Convening Authority will consider, prior to taking initial Action, are: the Accused's handwritten manuscript . . .; and the Accused's one-page handwritten letter to the Staff Judge Advocate, dated 13 February 2017. These matters constitute the entirety of the defense's post-trial submission, pursuant to RCM 1105 and 1106 and Article[s] 38(c) and 60 of the UCMJ.

According to Appellant, there is no indication that any other pertinent communications occurred, whether between the SJA and Appellant or between the SJA and Appellant's counsel, about waiving his post-trial right to counsel.

Before this Court, Appellant now argues that the SJA needed to inquire further into whether Appellant knowingly waived his right to counsel for post-trial proceedings. Citing no legal authority, he asserts that this "inquiry must, at the very least, naturally lie somewhere between the thorough colloquy for waiver at trial and thorough advisement on appeal." Appellant's Brief at 150. Appellant maintains that the inquiry that actually occurred in this case was insufficient to ensure that his purported waiver of counsel in the post-trial period was "knowing, intelligent, and voluntary" because the "SJA relied on a handwritten note alleging waiver, made no follow up with counsel or the [A]ppellant, and, in fact, continued to engage with [the civilian defense counsel] as if [A]ppellant were still represented." *Id.* at 150-51.

## II. Standard of Review

Whether the right to post-trial counsel was validly waived is a question of law we review de novo. *See Rosenthal*, 62 M.J. at 262; *Mix*, 35 M.J. at 286. Although Appellant raises this issue for the first time in this Court, the

parties are in agreement that this de novo standard of review applies in this instance, and we concur.

## III. Discussion

In prior cases, we have not identified any particular standard that applies when an accused seeks to waive the right to counsel and proceed pro se in the clemency process. *See United States v. Knight*, 53 M.J. 340, 342 (C.A.A.F. 2000); *cf. Mix*, 35 M.J. at 286 (declining to "decide what type of inquiry is required" to determine whether an accused may proceed pro se at trial). However, for purposes of this appeal we will assume that an accused's decision to proceed pro se during post-trial clemency proceedings is valid only if the accused knowingly, voluntarily, and intelligently waived the right to counsel. *See Faretta*, 422 U.S. at 835; *see also Tovar*, 541 U.S. at 87-88; *Knight*, 53 M.J. at 342 (requiring, at a minimum, that an accused's waiver of counsel during the post-trial stage of his or court-martial, to include the submission of clemency matters, be "knowing"). This inquiry into whether a waiver was knowing, voluntary, and intelligent is case specific.

Similarly, in prior cases we have not clearly defined the specific steps or inquiries that a military judge or a staff judge advocate must make before an accused may validly waive his or her right to post-trial counsel. *See Mix*, 35 M.J. at 286 (declining to decide the "exact extent of the inquiry necessary to ensure a knowing and intelligent waiver" of counsel at trial by a military judge); *cf. Tovar*, 541 U.S. at 88 ("We have not, however, prescribed any formula or script to be read to a defendant who states that he elects to proceed without counsel."). Rather, we have engaged in a case specific review of the record to determine whether there were sufficient indicia of a waiver of post-trial representation.

Upon engaging in this inquiry in the instant case, we conclude there are five key points which collectively demonstrate that Appellant's waiver of his right to counsel was valid.

First, the military judge advised Appellant on post-trial matters, and Appellant signed a "Post-Trial and Appellate Rights" form acknowledging that standby counsel had advised him of these rights. The record therefore shows that Appellant knew his post-trial rights and their importance, to include Appellant's ability to submit matters for the convening authority's consideration when he was deciding whether to approve the findings and sentence. *Cf. United States v. Palenius*, 2 M.J. 86, 91-92 (C.M.A. 1977) (faulting defense counsel for not advising the appellant of the "powers of the [the lower appellate court] and of the defense counsel's role in causing those powers to be exerted").

Second, in a letter to the SJA, Appellant stated the following: "Effective immediately, I . . . am representing myself . . . . Please don't involve any lawyers for as I have clearly stated above I am representing myself and *understand the consequences* . . . ." (Emphasis added.)[36] Appellant further wrote, "The presiding judge (Colonel [Osborn]) allowed me to represent myself during the trial so you should not hesitate to do so now in these post-trial matters." Appellant thus acknowledged he understood the consequences of self-representation. *Cf. Palenius*, 2 M.J. at 91 (stating that the accused must be aware "of the consequences of proceeding or of permitting his appeal to proceed without the assistance of an attorney").

Third, the SJA prudently contacted Appellant's civilian defense counsel to confirm Appellant's waiver. *See United States v. Carter*, 40 M.J. 102, 105 (C.M.A. 1994) (requiring the SJA to notify "defense counsel of appellant's complaint [of counsel's effectiveness] so that the issue of further representation [can be] resolved"). Although defense counsel's response is not in the record before us, the SJA sent a

---

[36] This was not a hollow claim. As reflected in Issue I above, the military judge repeatedly informed Appellant of the consequences of proceeding pro se at trial. Although Appellant is correct that "clemency is a wholly different stage of the proceeding[s]," Appellant's Brief at 151, many of the same considerations explained to Appellant at trial applied to the post-trial process as well.

follow-up letter notifying Appellant's counsel as follows: "In accordance with the Accused's and your request, the only post-trial defense matters the Convening Authority will consider" is Appellant's pro se material. Significantly, civilian counsel then withdrew his counseled memorandum and attachments.

Fourth, the SJA reported in her SJAR that Appellant "further states that he is fully aware of the consequences of representing himself, and requests that the Convening Authority should allow him to do so, as he was allowed to do so during his trial." This shows that the SJA did not have any reason to question Appellant's sincerity with respect to the waiver.

Fifth and finally, Appellant has not pointed to any record evidence or produced any affidavits suggesting that his waiver of the right to counsel during post-trial proceedings was anything other than voluntary, knowing, and intelligent. Rather, the record before us reveals that Appellant willingly submitted a handwritten letter not only stating that he wished to proceed pro se but also that he understood the consequences of forgoing his post-trial right to counsel, and his counsel then withdrew representation without any indication that Appellant objected.

All of these factors collectively provide us with a sufficient basis to conclude that Appellant's waiver was knowing, intelligent, and voluntary. Accordingly, we find Appellant validly waived his post-trial right to counsel.

### Issue IX: Whether then-Colonel Stuart Risch Was Disqualified from Participating [in] this Case as the Staff Judge Advocate

Appellant argues that the SJA was disqualified from participating in this case because a reasonable person would impute to him a personal interest in the outcome of Appellant's prosecution. We disagree. Moreover, even if we were to conclude that the SJA *was* disqualified, we hold that Appellant has failed to demonstrate prejudice.

## I. Background

Then-Colonel (COL) Risch[37] was the SJA in Appellant's case during the resolution of a number of pretrial matters. COL Risch lived with his family at Fort Hood and was on the installation the day of the attack. Further, according to a defense trial motion: COL Risch's wife was at home when the shootings began and COL Risch called his family to ensure their safety; after receiving assurances from his wife that his family was not in danger, COL Risch briefed the III Corps Commanding General about the incident; and COL Risch remained involved in the case in the days and weeks after the shooting and attended various briefings about the event itself and the status of the investigation.

In addition, two members of the Office of the Staff Judge Advocate (OSJA)—CPT NF and a civilian paralegal—were present at the Soldier Readiness Processing center when the shooting occurred. Although members of the OSJA were initially concerned about the safety of CPT NF and the civilian paralegal, neither of them was injured during the attack. Years later, CPT NF provided a declaration regarding his interaction with COL Risch on the evening of the attack:

> After [COL Risch] inquired into my well-being, I briefed him as to what I had witnessed . . . .
>
> Several days later, COL Risch spoke to myself and [the civilian paralegal] who had rendered first aid that day. He mentioned that he had toured the medical SRP building the evening of 5 November, that it was a difficult experience that would make it hard to sleep at night or words to that effect . . . .

---

[37] "Then-COL Risch" became the Deputy Judge Advocate General of the Army while Appellant's case was pending before the ACCA. At that time, he was a Major General (MG). He was then promoted to Lieutenant General and became the Judge Advocate General of the Army. For ease of reference, we will henceforth refer to him as COL Risch or MG Risch, as applicable, to reflect his rank during the time frames relevant to Issue IX and Issue X.

He suggested that we seek behavioral health as-
sistance as necessary.

More than a year and a half after the attack at Fort
Hood, in a three-page memorandum dated July 6, 2011,
COL Risch provided Article 34, UCMJ,[38] advice to the con-
vening authority. In this memorandum, COL Risch pro-
vided his legal conclusions that each specification alleged
an offense under the UCMJ, the allegation of each offense
was warranted by the evidence in the report of investiga-
tion, and the court-martial would have jurisdiction over the
accused and the alleged offenses. COL Risch also noted
that the company commander, the special court-martial
convening authority, and the Article 32, UCMJ, investigat-
ing officer[39] recommended trial by general court-martial,
and that the special court-martial convening authority and
the investigating officer further recommended a capital re-
ferral. Consistent with this advice, COL Risch recom-
mended that the convening authority refer the case to a
general court-martial as a capital case.

As a preface to this advice, COL Risch clarified that the
convening authority was "not required to take any specific
action or to dispose of the charges in any particular man-
ner," but rather that any "action taken [was] to be made
within [the convening authority's] sole, independent dis-
cretion." Further, COL Risch spelled out in the memoran-
dum the steps the convening authority should take if he
decided "to refer the case as non-capital." After considering
the SJA's advice "as well as the requests, written materi-
als, and presentations made . . . by the defense," the con-
vening authority approved the SJA's recommendation of a
capital referral.

Both prior to and subsequent to his recommendations
to the convening authority, COL Risch also gave advice on
a variety of other matters, including: (1) panel selection;
(2) the Government's requests for expert funding; and

---

[38] 10 U.S.C. § 834 (2006).

[39] 10 U.S.C. § 832 (2006).

(3) various defense requests.[40] COL Risch recommended granting some of these defense requests, denying others, and partially granting and denying others still. From the record before us, it appears that COL Risch recommended granting all the government's requests for funding.

Appellant claims that COL Risch should have been disqualified from participating as the SJA in this case. Specifically, Appellant contends that a reasonable person would impute to COL Risch a personal interest in the outcome of the case because: the shootings caused COL Risch to reasonably fear for his family; COL Risch feared for the safety of "a member of his OSJA family"; COL Risch "personally investigated the scene" the night of the attack; and finally, COL Risch was "part of the Fort Hood community that, itself, was a victim of the attack." Appellant's Brief at 156-59.

As to prejudice, Appellant argues that we should presume prejudice because COL Risch's pretrial advice probably had *some* bearing on the convening authority's decision to refer this case as capital. Alternatively, Appellant claims that the harmless beyond a reasonable doubt standard should apply to our analysis because the participation of a

---

[40] COL Risch gave advice on defense requests for: access to classified material, a meeting with the convening authority, appointment of a media analysis expert, a jury consultant, appointment of an expert military-religious consultant, appointment of an expert physiatrist, additional funding for mitigation support, additional funding for a psychologist, appointment of a forensic pathologist, appointment of Defense-Initiated Victim Outreach services, temporary duty assignment funds, appointment of an expert neurologist to conduct testing on the accused, funds for an expert to provide in-court testimony, additional funding for the services of the defense's social science methodology expert, appointment of an expert consultant on religious conversion, appointment of an expert on social science methodology, additional funding for the services of the defense's digital forensic examiner, and funding of a crime scene analyst.

disqualified SJA in the processing of a case "is akin to apparent unlawful command influence." *Id.* at 160.[41]

## II. Standard of Review

The issue of whether an SJA is disqualified from participating in court-martial proceedings is a question of law which we review de novo. *United States v. Chandler*, 80 M.J. 425, 429 (C.A.A.F. 2021).

## III. Applicable Law

Article 34 and R.C.M. 406 govern pretrial advice by an SJA. *See* R.C.M. 406(b) Discussion (2008 ed.) ("The [SJA] is personally responsible for the pretrial advice . . . . unless disqualified . . . ."). At the relevant time, R.C.M. 406(a) (2008 ed.) required the SJA to give "consideration and advice" "[b]efore any charge [could] be referred for trial by a general court-martial." *See also* Article 34(a), UCMJ. R.C.M. 406(b) also specified that the SJA's pretrial advice "shall include" the SJA's conclusions with respect to "whether each specification alleges an offense under the code," "whether the allegation of each offense is warranted

---

[41] In a footnote to his brief, Appellant argues that we should review COL Risch's "pretrial advice under a quasi-judicial standard." Appellant's Brief at 158 n.40. According to Appellant, when "acting in a quasi-judicial capacity, persons are held to a similar standard of impartiality as a military judge." *Id.* Appellant argues the test is objective: "whether a reasonable person, knowing all the relevant facts, would harbor doubts about the judge's impartiality." *Id.* (citing *Nichols v. Alley*, 71 F.3d 347, 350-51 (10th Cir. 1995)). For its part, the Government agrees with the lower court that "no case law 'supports the assertion that the SJA, in providing pretrial advice, must be held to the same standard of impartiality as a military judge.'" Appellee's Brief at 136 n.32 (citation omitted). We too find no support for Appellant's position. Furthermore, we note that even adopting the "objective standard" urged by Appellant there are no grounds to question COL Risch's pretrial advice. As discussed *infra*, we are "confident that an objective, disinterested observer would decide that the" capital referral "was a foregone conclusion." *United States v. Bergdahl*, 80 M.J. 230, 244 (C.A.A.F. 2020) (plurality opinion) (discussing unlawful command influence).

by the evidence indicated in the report of investigation," and "whether a court-martial would have jurisdiction over the accused and the offense," as well as the SJA's "[r]ecommendation of the action to be taken by the convening authority." R.C.M. 406(b)(1)-(4) (2008 ed.); *see also* Article 34(a)(1)-(3), UCMJ. This Court's predecessor noted that "the review by a legal advisor is a valuable pretrial protection to an accused. Generally speaking, it assures full and fair consideration of all factors." *United States v. Smith*, 13 C.M.A. 553, 557, 33 C.M.R. 85, 89 (1963).

When challenging an SJA's authority to provide pretrial advice, an appellant "has the initial burden of making a prima facie case" that the SJA was disqualified. *United States v. Taylor*, 60 M.J. 190, 194 (C.A.A.F. 2004). Article 6(c), UCMJ, provides grounds for disqualification in a case when the SJA "acted" as a member, military judge, trial counsel, defense counsel, or investigating officer in "the same case." 10 U.S.C. § 806(c) (2006); *see also* R.C.M. 406(b) Discussion (2008 ed.); R.C.M. 1106(b) (2008 ed.). Our precedent also provides for the disqualification of an SJA:

> when (1) he or she displays a personal interest or feeling in the outcome of a particular case; (2) there is a legitimate factual controversy with defense counsel; or, (3) he or she fails to be objective, such that it renders the proceedings unfair or creates the appearance of unfairness.

*Chandler*, 80 M.J. at 429 (citations omitted) (internal quotation marks omitted); *see also United States v. Dresen*, 47 M.J. 122, 124 (C.A.A.F. 1997) (recognizing the SJA must "be, and appear to be, objective"); *United States v. Willis*, 22 C.M.A. 112, 114, 46 C.M.R. 112, 114 (1973) (cautioning that an SJA "may become so deeply and personally involved as to move from the role of adviser to the role of participant"). "In determining whether an SJA is disqualified, this Court will consider 'the action taken, the position of the person that would normally take that action, and the capacity in which the action is claimed to have been taken.' " *Chandler*, 80 M.J. at 429 (quoting *United States v.*

*Stefan*, 69 M.J. 256, 258 (C.A.A.F. 2010)). We note, however, that even if this Court concludes that an SJA was disqualified from providing pretrial advice, that alone is not sufficient for relief. There must be prejudice. *See Stefan*, 69 M.J. at 258 ("We have not held that recommendations prepared by a disqualified officer [are] void. Rather, we test for prejudice . . . ." (first alteration in original) (citation omitted) (internal quotation marks omitted)).

## IV. Discussion

For the reasons set forth below, we conclude Appellant has not met his initial burden of making a prima facie case that COL Risch was disqualified from serving as the SJA in this case. Moreover, even if we *were* to conclude that COL Risch was disqualified, there is no basis to conclude that Appellant was prejudiced. Accordingly, we decline to grant Appellant relief on this issue.

### A. **SJA Disqualification**

Appellant claims that COL Risch was disqualified because he "was 'so closely connected'" to this case that he had a personal interest in its outcome. Appellant specifically cites the following points: "the shootings caused [COL Risch] to reasonably fear for his family"; COL Risch's close colleague "was directly involved in the attack"; COL Risch "personally investigated the scene" on the night of the offense; and COL Risch "was part of the Fort Hood community that, itself, was a victim of the attack." Appellant's Brief at 156-58. We are unpersuaded.

First, Appellant claims that a reasonable person would impute to COL Risch a personal interest in the outcome of this case because as soon as COL Risch was notified of the attack, "he immediately called his wife to ensure the safety of her and his family who resided on post." *Id.* at 156. However, as it turned out, no member of COL Risch's family was harmed in the attack or was ever in direct danger. And the mere fact that COL Risch checked on his family's well-being during the unfolding of a dynamic situation does not, standing alone, call into question COL Risch's ability to be

impartial when providing legal advice in this case. Concern for the safety of one's family may be relevant in some circumstances, but it is not itself disqualifying. *See, e.g.*, *Hasan*, 71 M.J. at 419 (identifying the military judge's and his family's presence "at Fort Hood on the day of the shootings" as "not disqualifying" in and of itself).

Second, Appellant claims that COL Risch had a personal interest in the outcome of this case because "he feared for the safety of CPT [NF], a member of his OSJA family, who was directly involved in the attack." Appellant's Brief at 156. Indeed, Appellant claims this was "the most disqualifying fact." Reply Brief at 62. Appellant analogizes the facts of his case to that of *United States v. Nix*, 40 M.J. 6 (C.M.A. 1994). In *Nix*, our predecessor court found a special court-martial convening authority was disqualified from forwarding charges when, shortly before trial, he married a woman with whom Nix was suspected of having a romantic relationship. *Id.* at 7-8. But the facts of *Nix* are distinguishable. To begin with, *Nix* dealt with a convening authority, not an SJA as is the case here, and their roles and their authority in the pretrial process are dissimilar. Further, the spousal relationship at issue in *Nix* is entirely different than the relationship between a supervisor and his subordinate. Moreover, CPT NF was uninjured during the attack,[42] and he was not a named victim. And finally, COL Risch's natural concern for the safety of a subordinate is hardly "antithetical to the integrity of the military justice system as to disqualify him from participation." *United States v. Engle*, 1 M.J. 387, 389 (C.M.A. 1976). As appropriately noted by the Government, "it is wholly

---

[42] In his reply brief, Appellant suggests that CPT NF was a target of the attack. Reply Brief at 62 (claiming that rounds were fired in CPT NF's direction and that, according to Appellant's own statements, "every soldier was a target"). We acknowledge that CPT NF *could have been* injured. However, CPT NF stated that while "[r]ounds were fired in my direction," "whether [Appellant] was aiming at me I do not know." Importantly, in his own words, CPT NF stated he "was uninjured" during the attack.

unremarkable that COL Risch expressed concern for the well-being of his subordinates." Appellee's Brief at 135.

Third, Appellant claims that COL Risch was disqualified because he "personally investigated the scene [of the attack] that very night." Appellant's Brief at 157. At the outset, it is important to note that despite the wording used in Appellant's brief, there is nothing in the record that indicates that COL Risch served as an investigator of this crime. And the fact COL Risch visited the crime scene does not, by itself, give reason to doubt his objectivity under *Chandler*. Indeed, it is notable—as the ACCA pointed out—that COL Risch was *required* to expose himself to disturbing images and witness accounts in order to effectively perform "his role as SJA under R.C.M. 406 . . . pursuant to Article 32, UCMJ." *Hasan*, 80 M.J. at 706.

Appellant further argues that COL Risch's comments to CPT NF after visiting the scene of the attack "evidenced an emotional disturbance" that "underscores the point" about COL Risch's disqualification. Appellant's Brief at 157. We are not convinced. COL Risch's purported comments—that visiting the SRP center building "was a difficult experience that would make it hard to sleep at night"—do not suggest a level of personal interest that is disqualifying. Setting aside possible concerns about the accuracy of these reported comments by COL Risch,[43] we find, like the lower court, that they were mere "expression[s] of empathy." *Hasan*, 80 M.J. at 706. And without more, there is nothing necessarily incompatible with expressing empathy at the

---

[43] In May 2018, CPT NF had a conversation with a member of Appellant's appellate defense team in which CPT NF described what COL Risch purportedly said after visiting the SRP center building. That same day, CPT NF wrote a statement memorializing his conversation with the member of Appellant's defense team. However, we note that this statement was written nearly *nine years* after the attack. Perhaps acknowledging this significant lapse in time, CPT NF qualified that he was not quoting COL Risch but rather was stating that COL Risch had used "words to that effect."

time of an incident and later being objective when performing legal duties.

In arguing this ground for disqualification, Appellant likens COL Risch's actions to the facts in *Brookins v. Cullins*, 23 C.M.A. 216, 49 C.M.R. 5 (1974), a case where the convening authority witnessed the offense at issue and our predecessor court found, for a number of reasons, that he was disqualified. But we do not find *Brookins* on point. To begin with, we do not accept Appellant's premise that visiting a crime scene is akin to witnessing an offense. Next, even if the two were comparable, the *Brookins* Court specifically stated that it "need not decide whether merely witnessing the commission of an offense is sufficient to disqualify the convening authority." *Id.* at 218, 49 C.M.R. at 7. And finally, Appellant does not make it clear why *Brookins*, a case analyzing grounds for disqualifying a convening authority, should be extended here to apply to an SJA. *Cf. United States v. Brocato*, 4 F.4th 296, 302-03 (5th Cir. 2021) (stressing that in the context of recusal for federal civilian judges, "each recusal case '. . . must be judged on its unique facts and circumstances more than by comparison to situations considered in prior jurisprudence' " (quoting *United States v. Jordan*, 49 F.3d 152, 157 (5th Cir. 1995))).

For his final argument, Appellant claims that COL Risch had a personal interest in the outcome of the case because he "was part of the Fort Hood community that, itself, was a victim of the attack." Appellant's Brief at 158. We acknowledge the personal impact the Fort Hood shootings may have had on COL Risch. However, the record before us is insufficient to establish that COL Risch actually "display[ed] 'a personal interest or feeling in the outcome of [Appellant's] case.' " *Chandler*, 80 M.J. at 429 (quoting *United States v. Sorrell*, 47 M.J. 432, 433 (C.A.A.F. 1998)). Accordingly, Appellant cannot succeed on this argument.

Appellant argues that when considering the four points that he raises, we should take a "totality of the circumstances" approach. Appellant's Brief at 158. We agree. But even considering all four alleged circumstances together,

we do not find a sufficient basis to conclude that a reasonable person would impute to COL Risch a personal interest in the outcome of this case. Accordingly, we find COL Risch was not disqualified.

## B. Prejudice

We deem it prudent to now turn our attention to the issue of whether Appellant would merit relief even if COL Risch was disqualified from serving as the SJA in this case. In his initial brief, Appellant focuses the prejudice discussion on COL Risch's Article 34 pretrial advice and his advice regarding member selection. In doing so, Appellant argues that this Court should depart from its disqualification case law and presume prejudice or, in the alternative, assess this alleged error for harmlessness beyond a reasonable doubt. Appellant specifically urges this Court to extend the rule from *Nix*, which seemed to hold that courts "must assume the [special court-martial convening authority's] recommendation influenced the [general court-martial] convening authority's decision to refer the charges to a general court-martial." 40 M.J. at 8. Alternatively, Appellant argues that "the prejudice standard should be harmless beyond a reasonable doubt because the participation of a disqualified officer in the processing of appellant's case is akin to apparent unlawful command influence." Appellant's Brief at 160.

We decline Appellant's invitation to depart from our precedent in regard to these two points. Simply stated, Appellant's arguments are squarely foreclosed by *Stefan*, 69 M.J. at 258, which rejected a presumption of prejudice for disqualified SJAs and did not apply a harmless beyond a reasonable standard. As articulated by the *Stefan* Court, "We have not held that recommendations prepared by a disqualified officer [are] void. Rather, we test for prejudice under Article 59(a) . . ., which requires material prejudice to the substantial rights of the accused." *Id.* (first alteration in original) (citation omitted) (internal quotation marks omitted); s*ee also id.* (rejecting the appellant's request to presume prejudice because even though the SJA was disqualified under Article 6(c), "these kinds of

[disqualification] errors are amenable to being tested for prejudice"); *Taylor*, 60 M.J. at 194-95 (assessing the SJA's error in failing to recuse for prejudice); *Sorrell*, 47 M.J. at 434 (same).

We further note that Appellant's analogy to the unlawful command influence context is misplaced. The SJA's role is to provide legal advice, and it would be the rarest of circumstances where an SJA would be senior in rank to a convening authority and could thus unlawfully influence the convening authority's decision-making. Indeed, COL Risch demonstrably was not senior in rank to the convening authority in the instant case. Moreover, the lack of any recommendations by COL Risch that were inexplicably adverse to Appellant undermines any appearance of partiality claim that has previously resulted in relief in the command influence context. *See United States v. Horne*, 82 M.J. 283, 289 (C.A.A.F. 2022) ("[T]he lack of personal prejudice is still a 'significant factor in determining whether the unlawful command influence created an intolerable strain on the public's perception of the military justice system.'" (quoting *United States v. Proctor*, 81 M.J. 250, 255 (C.A.A.F. 2021))). Accordingly, contrary to Appellant's assertions, we must engage in a typical prejudice analysis when assessing whether a disqualified SJA's pretrial advice and advice on member selection merits relief.

Turning to the pretrial advice in the course of our prejudice analysis, we note that Appellant does not take issue with COL Risch's conclusions that the specifications alleged offenses under the UCMJ, that the facts supported those specifications, that a court-martial would have jurisdiction over Appellant and his offenses, or that an aggravating factor was present. Nor does Appellant identify any other aspect of COL Risch's Article 34 pretrial advice as being problematic or evincing bias that improperly influenced his recommendations. In fact, a review of the record evidence makes "it impossible to believe that anyone else would have recommended action other than was recommended by" COL Risch. *Smith*, 13 C.M.A. at 559, 33 C.M.R. at 91; *see also Stefan*, 69 M.J. at 259 (finding no prejudice

in part because given the circumstances of the case, "including the host of offenses committed by [a]ppellant and the seriousness of some of his crimes, there is nothing that would suggest that another SJA would have made a different recommendation" (footnote omitted)); *cf. United States v. Tittel*, 53 M.J. 313, 314 (C.A.A.F. 2000) (agreeing with the lower court that "[i]n light of the serious nature of the charges facing the appellant" it was "unlikely that any competent authority would not have referred this case to a special court-martial" (citation omitted) (internal quotation marks omitted)); *Tovarchavez*, 78 M.J. at 462 n.5 ("In the context of nonconstitutional errors, courts consider whether there is a '*reasonable probability* that, but for the error, the outcome of the proceedings *would have been different.*'" (quoting *Molina-Martinez v. United States*, 578 U.S. 189, 194 (2016))). In other words, Appellant has not demonstrated any prejudice resulting from an act or omission of COL Risch in his Article 34 pretrial advice.

Similarly, Appellant has not adequately demonstrated prejudice arising from COL Risch's performance of any other pretrial functions. *See United States v. Moorefield*, 66 M.J. 170, 171 (C.A.A.F. 2008) (per curiam) (noting the appellant had "not shown that anything [the SJA] did or did not do in the course of the second court-martial prejudiced him"). For example, Appellant fails to articulate with any specificity how COL Risch's purported "personal interest" in this case, or his purported lack of objectivity, influenced his advice. Therefore, under these facts and circumstances, we are unable to discern any prejudice that would merit relief even if we concluded that COL Risch was disqualified from serving as the SJA.

As to the selection of members, Appellant has not described COL Risch's role in, nor pointed to anything in the record regarding, the member selection process. Our own review of COL Risch's memoranda reveals that his member selection advice was "boilerplate" in nature, simply laying out the law governing panel selection and advising the convening authority as to the number of members to be selected as well as excusal conditions and various other

administrative details. Consequently, Appellant has failed to show how these memoranda, or any other actions COL Risch may have taken in the panel selection process, were prejudicial.

To conclude, we hold that Appellant has not demonstrated COL Risch was disqualified from serving as the SJA in Appellant's case. In addition, we find that even if COL Risch was disqualified, Appellant did not suffer prejudice. Therefore, Appellant is not entitled to relief on this issue.

## Issue X: Whether the Judges of the Army Court of Criminal Appeals Should Have Been Recused Because They Were Supervised by then-Major General Stuart Risch While His Error as the Staff Judge Advocate Was Pending Litigation Before Them

Appellant argues that the judges of the ACCA abused their discretion when they failed to recuse themselves from this case. In support of his argument, Appellant cites the fact that the ACCA judges were supervised by MG Risch at the same time they had pending before them an issue involving then-COL Risch's failure to recuse himself as the staff judge advocate. Appellant asserts that a reasonable person would question the impartiality of the ACCA judges under these circumstances. However, for the reasons provided below, we conclude that the ACCA judges did not abuse their discretion when they declined to recuse themselves. Moreover, we conclude that even if the ACCA judges were disqualified from hearing Appellant's case, setting aside the lower court's opinion as requested by Appellant is not warranted. *See Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847 (1988).

### I. Background

As discussed *supra*, at the time of Appellant's attack in 2009, COL Risch served as the staff judge advocate for III Corps and Fort Hood. Following the shooting, COL Risch provided pretrial advice to the convening authority,

including Article 34 advice regarding the referral of charges. *See Hasan*, 80 M.J. at 704.

Subsequently, MG Risch became the Deputy Judge Advocate General of the Army after Appellant's case was docketed at the ACCA. Several ACCA judges recused themselves from Appellant's case while it was pending review. *Id.* at 690 n.1. In 2018, three ACCA judges were assigned to the case—Chief Judge Berger, Judge Schasberger, and Judge Hagler. MG Risch served as the rater for Chief Judge Berger, and as the rater and senior rater for the other ACCA judges. However, three other ACCA judges—Senior Judge Brookhart, Chief Judge (IMA[44]) Krimbill, and Judge Rodriguez—were assigned to the court in the summer of 2019, and it is these three judges who were responsible for the court's published opinion in this case. *Hasan*, 80 M.J. at 690. MG Risch initially served as their rater as well.

During the pendency of the ACCA appeal, Appellant filed three motions to disqualify the various ACCA judges who presided over Appellant's appeal because of MG Risch's rating relationship with them. The first motion was filed on July 11, 2018, and was denied by the ACCA on August 17, 2018. Appellant later submitted a motion for reconsideration, which the ACCA denied on December 6, 2018.

In the summer of 2018, Appellant submitted a motion to the ACCA requesting "funding for expert assistance to conduct a nationwide survey." In relevant part, Appellant wanted to "assess public opinion on the question of perceived partiality of [COL] Risch in providing pre-trial advice and perceived partiality of [the ACCA] in assessing MG Risch's conduct." The ACCA denied this motion.

---

[44] An IMA is an individual mobilization augmentee. This is a reservist who "support[s] an operational requirement for" the Army. *United States v. Shea*, 76 M.J. 277, 279 n.2 (C.A.A.F. 2017); *see also* Dep't of the Army, Reg. 140-145, Individual Mobilization Augmentation Program para. 1-6 (Mar. 21, 2022).

Also in the summer of 2018, Appellant filed a motion with the ACCA seeking a "protective order directing [MG] Risch" and others "to preserve and maintain any and all correspondence related to *United States v. Hasan* and any and all correspondence about the attack itself." Appellant noted that this motion was related to the "allegation of error regarding MG Risch's potential bias . . . that may have affected the pre-trial advice," and reasoned that the "correspondence may reveal further evidence of alleged bias." The ACCA denied this motion.[45]

Following the ACCA litigation on the first motion to recuse, Appellant filed a petition for extraordinary relief in the nature of a writ of mandamus with this Court seeking the recusal of the ACCA judges. *Hasan v. United States Army Court of Criminal Appeals*, 78 M.J. 189, 189-90 (C.A.A.F. 2018) (filing). In a summary disposition, this Court denied Appellant's petition because:

> Petitioner has failed to demonstrate that he cannot obtain relief through alternative means. He may still make an administrative request to remedy the alleged source of bias, and of course, he is entitled to raise this issue in the ordinary course of appellate review. Further, Petitioner has failed to demonstrate a clear and indisputable right to the writ as the harm he asserts is entirely speculative at this stage of the proceedings.

*Hasan v. United States Army Court of Criminal Appeals*, 79 M.J. 29, 30 (C.A.A.F. 2019) (summary disposition).

Appellant filed his third recusal motion with the ACCA on August 14, 2020. This motion sought the recusal of those judges of the court who would hear oral arguments and issue the written opinion in this case "on the grounds that MG Risch is the senior rater for [those] judges." The ACCA

---

[45] In his July 11, 2018, motion seeking the recusal of the ACCA judges, Appellant also averred that a motion previously submitted to the ACCA for investigative assistance was predicated, in part, on Appellant's desire to investigate MG Risch's "other than official interest" in the case. The ACCA denied this motion as well.

denied that motion on September 9, 2020. The Army Court stated that it would "provide the basis for this ruling in conjunction with [its] decision on [A]ppellant's assigned errors," but it never did so.

On July 29, 2020, Appellant submitted a request to the Judge Advocate General of the Army, who at that time was LTG Charles Pede, seeking a modification of the rating scheme for those ACCA judges who were presiding over his case. In a response dated September 16, 2020, LTG Pede stated that although he determined there was "no conflict of interest" regarding MG Risch's rating relationship with the ACCA judges, he decided that "out of an abundance of caution, and to moot any concerns" he—LTG Pede—would serve "as both the rater and senior rater" for any ACCA judge who reviewed the merits of Appellant's case.

The ACCA heard oral argument in Appellant's case on October 15, 2020, and issued its opinion affirming the findings and sentence on December 11, 2020.

Before this Court, Appellant argues that "a reasonable person would . . . question the impartiality of the Army Court when litigation was pending before them regarding their supervisor." Appellant's Brief at 163. Appellant further argues that MG Risch's eventual removal as the rater of the ACCA judges failed to resolve the conflict because the Army Court "operated under the conflict for more than three years in which it issued numerous rulings that directly and substantively affected the resolution of this case," including rulings involving MG Risch. *Id.* at 163-64. Appellant maintains that LTG Pede's removal of MG Risch as the ACCA judges' rater did not "retroactively resolve" the conflict and that "the Army Court's opinion did not address the conflict at all" despite that court's assurances to "the parties that it would disclose the reason(s) in its final opinion for not disqualifying themselves." *Id.* at 164. Ultimately, Appellant asserts that after applying the three factors from *Liljeberg*, setting aside the lower court's opinion is required as a result of the ACCA recusal error.

In response, the Government argues that when LTG Pede removed MG Risch from the ACCA judges' rating chain—as requested by Appellant—the recusal issue became moot. Moreover, the Government contends that there was no need for the ACCA judges to recuse themselves because "[a] reasonable person with knowledge of all the facts regarding [MG] Risch's involvement in this case would have no doubts about the impartiality of" the ACCA judges. Appellee's Brief at 139 (footnote omitted). The Government points to two factors to support this point: (1) MG Risch was no longer in the rating chain of the ACCA judges by the time they heard oral argument or issued their opinion; and (2) even before this change in the rating chain, the sole issue that came before the ACCA involving COL Risch did not challenge his legal advice or his ethical conduct. Finally, the Government asserts that, even if recusal was warranted, the *Liljeberg* factors favor upholding the ACCA's decision.

## II. Standard of Review

An "appellate judge's decision on recusal is reviewed for an abuse of discretion." *United States v. Jones*, 55 M.J. 317, 320 (C.A.A.F. 2001); *United States v. Hamilton*, 41 M.J. 32, 39 (C.M.A. 1994). "A[n] [appellate] judge's ruling constitutes an abuse of discretion if it is 'arbitrary, fanciful, clearly unreasonable or clearly erroneous,' not if this Court merely would reach a different conclusion." *United States v. Sullivan*, 74 M.J. 448, 453 (C.A.A.F. 2015) (quoting *United States v. Brown*, 72 M.J. 359, 362 (C.A.A.F. 2013)).

## III. Applicable Law

Whether an appellate military judge must recuse himself or herself from sitting on a given case is assessed according to the standards laid out in R.C.M. 902. *United States v. Mitchell*, 39 M.J. 131, 142 (C.M.A. 1994). In relevant part, that rule provides that "a military judge shall disqualify himself or herself in any proceeding in which that military judge's impartiality might reasonably be questioned." R.C.M. 902(a) (2019 ed.); *see also* R.C.M. 902(c)(1) (2019 ed.) (" 'Proceeding' includes . . . appellate

review . . . ."). "The standard for deciding the Manual judicial-disqualification question is . . . . whether a reasonable person *who knew all the facts* might question these appellate military judges' impartiality." *Mitchell*, 39 M.J. at 143. This requirement for recusal "enhances public confidence in the judicial system by ensuring that judges avoid the appearance of partiality." *Jones*, 55 M.J. at 319.

"The tension created by the placement of the military judiciary within the officer personnel structure requires military judges to be sensitive to particular circumstances that may require consideration of recusal." *United States v. Norfleet*, 53 M.J. 262, 268 (C.A.A.F. 2000). "Each . . . case must be assessed on its own merits." *Id.* at 270. The mere "fact that military judges may issue rulings adverse to the interests of superior officers, however, does not in itself preclude those judges from exercising independence in their judicial rulings." *Id.* at 268. Also, standing alone, "preparation of fitness reports for appellate military judges by senior judge advocates does not create a circumstance in which the impartiality of a judge might reasonably be questioned under RCM 902(a)." *Id.* at 269 (citing *Mitchell*, 39 M.J. at 131).

However, there may be "facts and circumstances [that] call for" recusal. *Id.* at 270. After all, "judicial officials may have relationships which cast suspicion upon their fairness or impartiality." *Id.* Most relevant to the present case is this Court's statement that questions may arise about the impartiality of appellate military judges if they "review[] a case where the Judge Advocate General or the Assistant Judge Advocate General, prior to their appointment, acted as a military trial judge, trial counsel, defense counsel, or *staff judge advocate* in that case." *Mitchell*, 39 M.J. at 145 n.8 (emphasis added). "There may be cases in which the ruling by a military judge on an issue would have such a significant and lasting adverse direct impact on the professional reputation of a superior for competence and integrity that recusal should be considered." *Norfleet*, 53 M.J. at 271.

When appellate military judges err in failing to recuse themselves in a case, we test for prejudice using the

*Liljeberg* factors. *See United States v. Witt*, 75 M.J. 380, 384 (C.A.A.F. 2016); *United States v. Roach*, 69 M.J. 17, 20-21 (C.A.A.F. 2010).

> In *Liljeberg*, the Supreme Court considered three factors to determine whether a remedy is warranted for a judge's failure to recuse himself [or herself]: (1) the "risk of injustice to parties in the case"; (2) the "risk that the denial of relief will result in injustice in other cases"; and (3) the "risk of undermining public confidence in the judicial process."

*United States v. Rudometkin*, 82 M.J. 396, 398 (C.A.A.F. 2022) (quoting *Liljeberg*, 486 U.S. at 864).

## IV. Discussion

We conclude that the ACCA judges did not abuse their discretion by declining to recuse themselves from this case. But even if they did abuse their discretion, setting aside the lower court's opinion is not warranted under *Liljeberg*.[46]

## A. Recusal

We acknowledge that Appellant's basic premise—a reasonable person would question the ACCA judges' impartiality when they decided issues pertaining to errors allegedly committed by their then-superior officer and rater—is facially appealing. However, in resolving recusal issues of this nature, the key is whether "a reasonable person *knowing all the facts and circumstances . . .* could question [the judges'] impartiality or independence in reviewing appellant's case." *Mitchell*, 39 M.J. at 144. And here, the

---

[46] We disagree with the Government's contention that because MG Risch was removed as the rater of the ACCA judges, the recusal issue is moot. The ACCA decided motions on issues pertaining to MG Risch before he was removed as the judges' rater—thereby calling the validity of those decisions into question—and "an issue is moot [only] if resolving it 'would not result in a material alteration of the situation for the accused or for the Government.'" *United States v. Napoleon*, 46 M.J. 279, 281 (C.A.A.F. 1997) (quoting *United States v. Clay*, 10 M.J. 269 (C.M.A. 1981)).

attendant facts and circumstances demonstrate that the ACCA judges who handled this case did not abuse their discretion by declining to recuse themselves. We specifically highlight two points in our analysis.

First, in terms of the rulings made by the ACCA judges during the time when MG Risch still served as their rater,[47] a reasonable person would know certain key facts. To begin with, it is true that the Army Court denied a defense request for "expert funding to conduct a survey . . . relating to . . . whether members of the public would draw negative connotations from then-[COL] Risch['s] actions as the SJA and for his relationship with the court." Appellant's Brief at 37. However, this defense request was, to say the least, novel. Moreover, it was ancillary not only to the question of the guilt or innocence of the accused but also to the question of whether this case was properly handled procedurally. Therefore, a reasonable person would conclude that the decision by the ACCA judges to deny this request was inevitable and not a result of them trying to curry favor with MG Risch.

Similarly, the defense request for "a protective order directing . . . [MG] Risch" and others "to preserve and maintain any and all correspondence related to *United States v. Hasan* and any and all correspondence about the attack itself" was unusual if not unprecedented in military justice. Indeed, the only authority cited by Appellant in support of this motion was *United States v. Campbell* which is not on point because it dealt with a "post-trial dispute over discovery relevant to an appeal." 57 M.J. 134, 138 (C.A.A.F. 2002). Therefore, once again a reasonable person would understand that the ACCA judges' handling of this matter was not predicated on their rating relationship with MG Risch.

Second, the sole assignment of error at the ACCA involving MG Risch did not challenge the substance of his

---

[47] As noted earlier, MG Risch had been removed from the ACCA judges' rating chain by the time the Army Court held oral argument and issued its opinion in this case.

legal advice. Rather, the alleged error was simply that MG Risch should have been disqualified from providing Article 34, UCMJ, pretrial advice to the convening authority. A reasonable person would conclude that these circumstances did not rise to the level where the ACCA judges would have been concerned that their decision on this issue "would have such a significant and lasting adverse direct impact on the professional reputation of a superior for competence and integrity" that their disqualification under R.C.M. 902 was mandated. *Norfleet*, 53 M.J. at 271.

Accordingly, the ACCA judges did not abuse their discretion when they declined to recuse themselves.

### B. *Liljeberg* Analysis

Even if we were to hold that the ACCA judges did abuse their discretion when they declined to recuse themselves from this case, the three *Liljeberg* factors show that vacatur of the lower court's opinion is not warranted. *See United States v. Martinez*, 70 M.J. 154, 158 (C.A.A.F. 2011) ("not every judicial disqualification requires reversal" and the *Liljeberg* factors "determine whether [an appellate] military judge's conduct warrants" a remedy).

We turn to the factors in order. First, the risk of injustice to Appellant was low. As the Government notes, "When the judges heard argument in this case and issued their opinion, MG Risch was no longer their rater." Appellee's Brief at 148. As for Appellant's contention that the ACCA judges "operated under [a] conflict for more than three years in which it issued numerous rulings that directly and substantively affected the resolution of this case," Appellant's Brief at 164, most of these rulings were unrelated to MG Risch. And as discussed above, it is unlikely that the motions related to MG Risch would have been favorably ruled upon by any appellate military judge.

Second, in terms of whether denying relief in this case will result in injustice in *future* cases, we concur with this Court's observation in *United States v. Butcher*: "It is not necessary to [vacate the lower court's opinion] in order to ensure that [appellate] military judges exercise the

appropriate degree of discretion in the future." 56 M.J. 87, 93 (C.A.A.F. 2001).

Third, the risk of undermining public confidence in the military judicial process by denying relief is low. As the Government notes, in light of the tenuous nature of the substantive arguments by Appellant, the remedy of vacatur would simply serve to "undermine the public's confidence in the certainty of military appeals courts' judgments." Appellee's Brief at 149-50.

Therefore, upon assessing the *Liljeberg* factors, even if the ACCA judges abused their discretion by declining to recuse themselves, the proposed remedy requested by Appellant of setting aside the lower court's opinion is not warranted. Accordingly, Appellant is entitled to no relief on this issue.

### Issue XI: Whether the Convening Authority Was Disqualified to Perform the Post-Trial Review of Appellant's Case After Awarding Purple Heart Medals to the Victims of Appellant's Offenses[48]

Appellant asserts that he was denied his "substantial right to an individualized, legally appropriate, and careful post-trial review of his convictions and sentence" by the convening authority. Appellant's Brief at 168. Specifically, he argues that LTG Sean MacFarland was disqualified from performing the post-trial review of this case because LTG MacFarland awarded Purple Heart medals to the victims of Appellant's offenses and gave remarks at the ceremony, thereby demonstrating that he "could not give [A]ppellant's case a fair review or protect the integrity of the process." *Id.* at 169. Accordingly, Appellant asserts that he was "denied his substantial right to an impartial review of his case, and [that] this Court should remand [A]ppellant's case for a new convening authority action." *Id.* at 170.

---

[48] As discussed *infra*, Appellant did not raise this issue before the lower court.

Contrary to Appellant's contentions, we hold that it was not plain error for LTG MacFarland to conduct the post-trial review of Appellant's case.

## I. Background

Prior to Appellant's trial, a bill was introduced in Congress that would have authorized the Army to award Purple Heart medals to Appellant's victims. H.R. Rep. No. 112-479, pt. 1, at 164 (2012).[49] The Army opposed this legislation because, among other reasons, it believed the bill "would undermine the prosecution of" Appellant "by materially and directly compromising [Appellant's] ability to receive a fair trial." However, in December 2014, after Appellant's conviction and sentencing, Congress passed subsequent legislation that authorized the military to award the Purple Heart medal to active duty service members "who [were] killed or wounded in an attack by a foreign terrorist organization" under such circumstances as existed in this case. 10 U.S.C. § 1129a(a)-(b) (2018); *see also* Dep't of the Army, Reg. 600-8-22, Personnel-General, Military Awards para. 2-8(b)(10) (Mar. 5, 2019). After the passage of this legislation, "the Secretary of the Army determined that servicemembers injured or killed in the Fort Hood attacks were eligible for the Purple Heart if they met the other regulatory criteria." *Berry v. Esper*, 322 F. Supp. 3d 88, 89 (D.D.C. 2018).

Appellant states that on April 10, 2015, LTG MacFarland awarded Purple Heart medals to the victims of the Fort Hood attack and made public remarks "regarding the victims, identifying their deaths and injuries as a sacrifice, construing their actions as courageous, brave, selfless, and valorous, and conjecturing that [A]ppellant would have inflicted greater calamity given the opportunity." Appellant's Brief at 169.[50]

---

[49] The bill also would have awarded the Purple Heart medal to the victims of an unrelated June 2009 attack on a recruiting station in Little Rock, Arkansas. H.R. Rep. No. 112-479, at 164.

[50] Appellant does not provide any joint appendix or record citations documenting the ceremony. For its part, the

Almost two years later, in March 2017, LTG MacFarland, in his capacity as the convening authority, approved the findings and the sentence in Appellant's case. Prior to that action, Appellant had submitted an approximately 450-page handwritten document addressing such topics as his understanding of Islam, his view of the world and the meaning of life, and "mans [sic] duty to his creator." In doing so, he explicitly informed the convening authority: "[T]his submission is not a plea for mercy."

Appellant submitted his initial appellate brief to the ACCA in November 2019, more than two and a half years after the award ceremony at issue. However, he did not raise this issue before the Army court.

## II. Standard of Review

The standard of review for this issue depends on whether the issue was waived, forfeited, or preserved. The Government argues that Appellant waived the issue. If the Government is correct, then we cannot review the issue at all. *United States v. Rich*, 79 M.J. 472, 476 (C.A.A.F. 2020). However, before deciding whether a waiver occurred, we must address two important preliminary questions.

The first question is whether the Government is asserting that Appellant *intentionally waived* the issue or instead is asserting that the issue *was waived by operation of law*. An intentional waiver occurs when a party intentionally relinquishes or abandons a known right. *United States v. Day*, 83 M.J. 53, 56 (C.A.A.F. 2022) (citing *United States v. Jones*, 78 M.J. 37, 44 (C.A.A.F. 2018)). In contrast, a "waiver by operation of law happens when a procedural rule or precedent provides that an objection is automatically waived upon the occurrence of a certain event and that event has occurred." *Id.* (citing *United States v. Swift*, 76 M.J. 210, 217-18 (C.A.A.F. 2017)). The Government's brief does not expressly identify the type of waiver that it contends occurred in this case. We nonetheless conclude

Government merely refers to an Army press release that is not part of the record.

that the Government is asserting that Appellant intentionally waived the issue. We reach this conclusion because the Government principally relies on *United States v. Gudmundson*, 57 M.J. 493, 495 (C.A.A.F. 2002), a case in which an appellant intentionally waived a disqualification issue, and because the Government does not cite any legal rule that provides that a failure to raise an issue constitutes waiver. Accordingly, we consider only whether Appellant expressly waived the issue and do not consider whether the waiver might have occurred by operation of law.[51]

The second preliminary issue concerns the Government's theory of how the intentional waiver occurred. On this point, the Government's brief is clearer. The Government asserts that Appellant waived the issue because he "makes no claim that he was unaware of [the convening authority's] role in the Purple Heart ceremony," and yet he made no mention of this issue in his submissions to the convening authority under R.C.M. 1105 and 1106. Appellee's Brief at 154. Accordingly, we consider only this specific theory of intentional waiver and we do not consider other possible theories of waiver.[52]

Having addressed these two preliminary issues, we now turn to the question of whether Appellant has intentionally waived the disqualification issue in the manner the Government alleges. This is "a legal question that this Court reviews de novo." *Day*, 83 M.J. at 56. We are aided in deciding this issue by two precedents. In *Gudmundson*, an appellant argued for the first time on appeal that the convening authority should have been disqualified from

---

[51] For example, we do not consider whether waiver by operation of law occurred under R.C.M. 1105(d)(1) or (2) (2008 ed.), which address the failure to submit matters to the convening authority that might affect the convening authority's decision whether to disapprove any findings of guilty or to approve the sentence.

[52] For example, we do not consider the possibilities that Appellant expressly waived the argument based on anything he or his counsel said in their submissions to the convening authority or by not raising the issue on appeal to the ACCA.

approving the findings and sentence because he had testified at a suppression hearing. 57 M.J. at 495. This Court held that the appellant had waived the objection because, having been present at the suppression hearing, the appellant clearly knew of the possible ground for disqualification but "he chose to not raise the disqualification issue at trial or in his post-trial submission to the convening authority." *Id.* In contrast, this Court in *United States v. Fisher* confronted a situation where the appellant argued for the first time on appeal before the CCA that the convening authority should have recused himself because the convening authority had made a statement disparaging defense counsel as unethical. 45 M.J. 159, 160, 163 (C.A.A.F. 1996). The Court held that the appellant had not waived the issue because there was "no evidence or other indication that [the] appellant, herself, was aware of [the convening authority's] statement and made a knowing and intelligent waiver of her right to contest his qualifications to take the action on her court-martial." *Id.* at 163.

We think that this case is much closer to *Fisher* than *Gudmundson*. The Government has cited nothing in the record establishing Appellant was aware that the convening authority had awarded Purple Heart medals to the victims of the shooting. Instead, as noted above, the Government only asserts that Appellant "makes no claim that he was unaware of [the convening authority's] role in the Purple Heart ceremony." Appellee's Brief at 154. Under *Fisher*, this assertion is insufficient to establish an intentional waiver. We therefore conclude that Appellant did not waive the disqualification issue.

The next question is whether Appellant forfeited the issue or preserved it. If an issue is forfeited, we review it for plain error. *United States v. Tunstall*, 72 M.J. 191, 193 (C.A.A.F. 2013). But if Appellant preserved the issue, we must review de novo his claim that the convening authority was disqualified from taking post-trial action on his court-martial. *United States v. Davis*, 58 M.J. 100, 102 (C.A.A.F. 2003). In the instant case, Appellant argues that we should review the issue de novo. We disagree. Although we accept

as true Appellant's assertion that at the time he filed his submission with the convening authority he did not know about the Purple Heart awards ceremony, he makes no similar representation regarding his filing with the lower court. Specifically, Appellant does not claim that at the time he filed his brief with the ACCA he was unaware of— or, using reasonable diligence, could not have been aware of—the Purple Heart awards ceremony. Further, we note that this ceremony took place approximately two and a half years before Appellant filed his initial brief with the lower court. And, to demonstrate the perils of considering an issue such as this one that was not considered below, we note that Appellant did not include in the record any documentation of the Purple Heart ceremony or the specifics of LTG MacFarland's participation in it.

Under these circumstances, we hold that Appellant has forfeited this issue because he failed to raise it in a timely manner before the court below. *See Rich*, 79 M.J. at 475 ("[F]orfeiture is the failure to make the timely assertion of a right . . . ." (citation omitted) (internal quotation marks omitted)). As a consequence, it is appropriate for this Court to apply a plain error standard of review. *United States v. King*, 83 M.J. 115, 120-21 (C.A.A.F. 2023) (applying plain error review under circumstances of forfeiture).

### III. Applicable Law

The version of Article 60, UCMJ, in effect at the time of Appellant's court-martial authorized the convening authority to set aside or change a finding of guilty and to "approve, disapprove, commute, or suspend the sentence in whole or in part." Article 60(c)(2), UCMJ, 10 U.S.C. § 860(c)(2) (2012). The applicable version of Article 60 further stated: "The authority under this section to modify the findings and sentence of a court-martial is a matter of command prerogative involving the sole discretion of the convening authority." Article 60(c)(1), UCMJ; *see also* R.C.M. 1107(b)(1) (2012 ed.).

This Court has identified two circumstances in which a convening authority is disqualified from taking this type of

discretionary post-trial action: (1) the convening authority "is an accuser, has a personal interest in the outcome of the case, or has a personal bias toward the accused"; or (2) the convening authority displays "an inelastic attitude toward the performance of their post-trial responsibility." *Davis*, 58 M.J. at 102 (citations omitted). Stated differently, "[w]here a convening authority reveals that the door to a full and fair post-trial review process is closed, . . . the convening authority must be disqualified." *Id.* at 103. When disqualification occurs, a different person authorized under the UCMJ is designated to exercise the powers outlined in Article 60. R.C.M. 1107(a) Discussion (2012 ed.).

If a disqualified convening authority takes post-trial action on a case, this constitutes error. In order to obtain relief, however, an appellant must make a "colorable showing of possible prejudice" resulting from the error. *United States v. Wheelus*, 49 M.J. 283, 289 (C.A.A.F. 1998) (internal quotation marks omitted) (quoting *United States v. Chatman*, 46 M.J. 321, 323-24 (C.A.A.F. 1997)). "By definition, assessments of prejudice during the clemency process are inherently speculative. Prejudice, in a case involving clemency, can only address possibilities in the context of an inherently discretionary act." *Taylor*, 60 M.J. at 195 (internal quotation marks omitted) (quoting *United States v. Lowe*, 58 M.J. 261, 263 (C.A.A.F. 2003)).

### IV. Discussion

Because a plain error standard of review applies in this instance, Appellant first has the burden of showing that it was "clear or obvious" error for LTG MacFarland to exercise his discretionary authority under Article 60 as the convening authority in this case. *See United States v. Adams*, 81 M.J. 475, 479 (C.A.A.F. 2021) (citation omitted) (internal quotation marks omitted). We conclude that Appellant has not met that burden. Specifically, Appellant has failed to establish that LTG MacFarland had a personal interest in the case, was biased against the accused, or had an "inelastic attitude" regarding the exercise of his post-trial discretionary authority. *Davis*, 58 M.J. at 102.

We underscore again that Appellant has failed to include in the record a transcript—or even excerpts or press clippings—of LTG MacFarland's remarks. But even assuming LTG MacFarland made the comments attributed to him by Appellant, these statements standing alone do not establish that LTG MacFarland was disqualified from subsequent participation as the convening authority in Appellant's case. Rather, we agree with the Government, which makes the following point:

> In presenting the medals, LTG MacFarland was performing an administrative act in his capacity as Commander of III Corps and Fort Hood. Although LTG MacFarland made statements valorizing the victims of the shooting, none of the statements indicated that he had the kind of personal connection with the case or bias that would be disqualifying.

Appellee's Brief at 156.

Appellant contends that LTG MacFarland's participation in the awards ceremony is self-evident "clear or obvious error" because the Army itself previously opposed a pretrial awards ceremony on the grounds that it could "materially and directly compromis[e Appellant's] ability to receive a fair trial." However, we perceive an important distinction between a pretrial event—where future panel members could have been affected—and a post-trial event. Simply stated, in the latter scenario the concern about Appellant receiving "a fair trial" no longer existed. Thus, rather than look to the Army's previous concerns under dissimilar circumstances, we must instead look to LTG MacFarland's statements themselves in order to discern any evidence of personal interest, bias, or "inelastic attitude" that merited his disqualification from serving as the post-trial convening authority. Even Appellant's own characterization of LTG MacFarland's remarks do not rise to that level. Accordingly, there is an insufficient basis to conclude that Appellant has met his burden of demonstrating clear or obvious error here.

Even if we were to conclude that LTG MacFarland's participation under Article 60 was clear or obvious error, Appellant fails in his effort to demonstrate prejudice. Appellant expressly stated in his post-trial submission to the convening authority that he was not seeking "mercy" (i.e., clemency) from him. As the Government convincingly argues, "An accused who fails to seek clemency from the convening authority has no basis for asserting [on appeal] that the convening authority prejudiced him by not granting him any." Appellee's Brief at 161.

Accordingly, based on the record before us, we cannot conclude Appellant has established plain error for his claim that LTG MacFarland was disqualified from conducting the post-trial review of his case.

### *Grostefon* Issue: Whether the Military Judge Erred in Preventing Appellant from Presenting a Defense of Others Defense

Pursuant to *Grostefon*, Appellant, through his counsel, personally asks us to consider whether the military judge erred in preventing Appellant from presenting at trial a "defense of others" defense. To resolve this issue, we first must determine whether Appellant's proposed defense was reasonably raised by his proffered evidence. Upon doing so, we conclude that there was no proffered evidence to support a finding that the members of the Fort Hood community who were attacked by Appellant wrongfully posed an imminent threat to anyone in Afghanistan. Accordingly, we hold that the military judge did not err in denying Appellant the opportunity to argue this proposed defense.

### I. Background

On June 4 and 10, 2013, Appellant submitted memoranda in support of his proposed "defense of others" defense (or, as he sometimes referred to it, "the Defense of thirds"). Appellant's essential claim was that the war in Afghanistan was an illegal American invasion. The Taliban was, according to Appellant, "the innocent victim of an unlawful attack by the United States military and did not have a duty to retreat." Appellant argued that because the

American presence in Afghanistan was illegal under international law, personnel of the United States military were "fair game" for the Taliban, including "uniformed soldiers in a designated deployment site getting ready to deploy to Afghanistan." Therefore, according to Appellant, "an armed individual that sympathizes with the illegality of the attack on the Taliban and attacks targets in its defense would be permissible." Appellant requested that the military judge "accept the Defense of thirds" as Appellant's defense and "give instructions to the panel accordingly."

The military judge ruled that even taking "as true the facts proffered by [Appellant], the proposed defense of others does not apply as a matter of law." The military judge recognized that the "principles of self-defense . . . apply to the defense of another." However, she concluded that this defense "was not at issue under any set of circumstances [presented here] because the victims in Fort Hood, Texas, posed no imminent or immediate threat of death or grievous bodily harm to anyone in Afghanistan." Thus, the military judge concluded that the "law does not support a defense of others under the facts and circumstances of this case."

Before this Court, Appellant maintains his actions were undertaken in defense of members of the Taliban because he "apprehended, on reasonable grounds, that death or grievous bodily harm" was about to be inflicted wrongfully upon them by the United States military. Appellant's Brief at A1-A2. Appellant argues the victims of his attack posed "an imminent threat to Taliban members" for two reasons: (1) "military personnel already represented an imminent danger" as the "United States had already engaged—and continued to engage—in an illegal attack against the Taliban"; and (2) "those pending deployment to support the United States operations constituted an imminent threat to the Taliban." *Id.*

## II. Standard of Review

The question of whether a special defense applies under the circumstances of a case is a matter of law, which we

review de novo. *United States v. Tokash*, 282 F.3d 962, 967 (7th Cir. 2002) ("The legal sufficiency of a proffered defense is a question of law and therefore is reviewed *de novo*."); *see also United States v. Davis*, 76 M.J. 224, 229 (C.A.A.F. 2017) (reviewing de novo whether a defense was "reasonably raised by the evidence").

### III. Applicable Law

"Defense of another may excuse [criminal] liability . . . ." *United States v. Ravenel*, 26 M.J. 344, 351 (C.M.A. 1988); *see also* R.C.M. 916(a) (2008 ed.) (defense of another does not deny "that the accused committed the objective acts constituting the offense charged," but "denies, wholly or partially, criminal responsibility for those acts"). Military law recognizes "defense of another" as a special "defense to homicide." R.C.M. 916(e)(5) (2008 ed.). This defense requires that the object of the defendant's protection have a right to self-defense in their own right and the accused did "not use more force than the person defended was lawfully entitled to use under the circumstances." *Id.*; *see also United States v. Lanier*, 50 M.J. 772, 777-78 (A. Ct. Crim. App. 1999) (noting that accused who claims the special defense of defending another "steps into the shoes of the defended person"). Therefore, the "principles of self-defense . . . apply to defense of another." R.C.M. 916(e)(5) (2008 ed.).

In cases of homicide, an individual has a right to self-defense where they "[a]pprehended, on reasonable grounds, that death or grievous bodily harm was *about to be* inflicted *wrongfully* on" that individual, and that the individual "[b]elieved that the force [the individual] used was necessary for protection against death or grievous bodily harm." R.C.M. 916(e)(1)(A)-(B) (2008 ed.) (emphasis added). In other words, the right to self-defense arises where an individual believes that a *wrongful* use of force is *imminent*. *See United States v. Bransford*, 44 M.J. 736, 738 (C.A.A.F. 1996) (equating "about to be" with "imminent"); *see also United States v. Yanger*, 67 M.J. 56, 58 (C.A.A.F. 2008) (finding the "possibility of self-defense was resolved" in part when the appellant "did not apprehend, reasonably

or otherwise, imminent bodily harm"); *Black's Law Dictionary* 898 (11th ed. 2019) (defining "imminent" as "threatening to occur immediately; dangerously impending" or "[a]bout to take place").

The test for whether this special defense may be raised at trial is whether the accused proffers *some* evidence of the elements of the defense. *United States v. Johnson*, 416 F.3d 464, 468 (6th Cir. 2005) (stating that when an affirmative defense is raised in a pretrial motion, "if the defendant's proffered evidence is legally insufficient to support a . . . defense, the trial judge should not allow its presentation to the jury"); *Tokash*, 282 F.3d at 967 ("[W]here the evidence proffered . . . is insufficient as a matter of law to support the affirmative defense a pre-trial ruling precluding the presentation of the defense at trial is appropriate."); *cf. United States v. Feliciano*, 76 M.J. 237, 240 (C.A.A.F. 2017) (requiring the military judge to instruct on a defense when " 'there is some evidence in the record, without regard to credibility, that the members could rely upon if they choose' " (quoting *United States v. Behenna*, 71 M.J. 228, 234 (C.A.A.F. 2012))).

## IV. Discussion

Appellant asserted before the military judge that he attacked his fellow soldiers at the Fort Hood SRP center because he was protecting members of the Taliban—located in Afghanistan—from imminent harm. Similarly, he argues before this Court that American military personnel posed an "immediate danger" to Afghan fighters because the United States "had already engaged—and continued to engage—in an illegal attack on the Taliban." Appellant's Brief at A2. However, the military judge found that any alleged threat was simply too remote for the "defense of others" defense to apply here. We agree.

The time and distance separating Fort Hood from Afghanistan is obvious. Therefore, there were no objectively "reasonable grounds" to believe that any of Appellant's victims were "about to" inflict harm on members of the Taliban. Without any proffer of evidence on this threshold issue

of whether there was an imminent threat, Appellant's special defense of "defense of others" was not supported by "some evidence."[53] Accordingly, the military judge did not err in refusing to allow Appellant to present a defense to the contrary. R.C.M. 916(e)(1)(A) (2008 ed.).

Appellant counters that the understanding of imminence should carry the same meaning here as was purportedly used by the United States to justify the targeted killing of Anwar al-Aulaqi (alternatively spelled "al-Awlaki"). Even if we were to assume there is some relevance to this line of argument, we are in no position to second guess the justification given by the United States that al-Aulaqi posed a continued and imminent threat. *See Al-Aulaqi v. Obama,* 727 F. Supp. 2d 1, 47 (D.D.C. 2010) ("[T]he D.C. Circuit has expressly held that the question whether an organization's alleged 'terrorist activity' threatens 'the national security of the United States' is 'nonjusticiable.'" (quoting *People's Mojahedin Org. of Iran v. U.S. Dep't of State,* 182 F.3d 17, 23 (D.C. Cir. 1999))); *see also El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 844 (D.C. Cir. 2010) ("It is not the role of judges to second-guess, with the benefit of hindsight, another branch's determination that the interests of the United States call for military action."). However, assessing whether Appellant can be held criminally liable for his actions falls squarely within our purview. And on that score, it is axiomatic that when it comes to defense of others, one must *reasonably* believe that others are in

---

[53] *See Tokash*, 282 F.3d at 967 ("To entitle a defendant to present an affirmative defense to the jury, his proffer must meet the minimum standard as to each element of the defense . . . . [and] must present more than a scintilla of evidence that demonstrates that he can satisfy the legal requirements for asserting the proposed defense." (citations omitted) (internal quotation marks omitted)); *Harris v. Scully*, 779 F.2d 875, 879 (2d Cir. 1985) (stating the trial judge properly denied a defense of others jury instruction because "no version of the events warrants an inference that petitioner reasonably believed that, at the time of the killing, [the victim] was using or was about to use deadly physical force against" others).

*immediate* danger of *unlawful* bodily harm. We find there is no support in the record for Appellant to claim he reasonably believed members of the Taliban were in immediate danger of unlawful bodily harm from his victims at the SRP center. For these reasons, the military judge properly excluded the "defense of others" defense.[54]

## Unbriefed Issues

In our Briefing Order, *United States v. Hasan*, 81 M.J. 238, 239 (C.A.A.F. 2021), we invited Appellant to raise "systemic issues previously decided by this Court but raised to avoid waiver." We stated that these systemic "issues may be listed without argument as an exception to Rule 24(a)" of this Court's Rules of Practice and Procedure,

---

[54] Appellant cites *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006), to argue that regardless of whether the "defense of others" defense was permissible, the military judge erred by prohibiting him from "providing his version of events." Appellant's Brief at A10-A11. However, as we recently noted in *United States v. Beauge*, 82 M.J. 157 (C.A.A.F. 2022), the *Holmes* Court stated "only rules which 'infring[e] upon a weighty interest of the accused *and* are arbitrary or disproportionate to the purposes they are designed to serve' will be held to violate the right to present a complete defense." *Id.* at 167 (alterations in original) (quoting *Holmes*, 547 U.S. at 324-25). As the Court of Appeals for the Sixth Circuit recognized in *Johnson*, 416 F.3d at 468:

> [It is] a trial judge's duty to require a *prima facie* showing by the defendant that he can produce evidence on each of the elements of the defense. A trial judge does not 'invade' the province of the jury when determining, as a preliminary matter, whether a defendant has met the burden of introducing sufficient evidence on each of the elements of an asserted defense . . . .

Indeed, by prohibiting Appellant's presentation of a nonviable defense, the military judge rationally prevented the waste of time and potential confusion that would have accompanied the admission of irrelevant evidence. Therefore, we do not find a basis to conclude that the requirement for Appellant to demonstrate the legal viability of his proposed defense was either arbitrary or disproportionate to the purposes served.

but we directed Appellant to "cite pertinent authority to support the position taken." *Id.* Appellant's opening brief with this Court includes the eleven briefed issues addressed above, and it also lists nine issues specific to this case and twenty-nine systemic issues regarding capital punishment.[55] However, Appellant did not provide any argument in support of the latter issues, nor did he cite pertinent authority for many of these listed issues as instructed by our Briefing Order. Furthermore, Appellant's reply brief focuses solely on the briefed issues.

We have reviewed each of these issues and conclude that Appellant is not entitled to relief.

### Judgment

The decision of the United States Army Court of Criminal Appeals is affirmed.

---

[55] These issues are listed in the Appendix to this decision. We note that some of the issues labeled as "systemic" by Appellant are, in fact, specific to his case. However, to remain consistent with the order the issues were presented in his brief, we use the same organizational scheme.

**Appendix[56]**

**Part A: Section IV (Case Specific Issues)**

**A.I**

Whether the military judge erred in finding that Appellant's waiver of counsel was knowing and intelligent when she received notice from his expert expressing concern over his "adjudicative capacity" and recommending further assessment for his schizotypal personality but failed to reopen the waiver inquiry, especially in light of the fact that she knew Appellant refused to submit to psychological testing during his Rule for Courts-Martial (R.C.M.) 706 board.

**A.II**

Whether the military judge erred to Appellant's substantial prejudice by denying his motion for change of venue.

**A.III**

Whether the military judge erred by not ensuring adequate voir dire that resulted in a panel that was tainted by excess publicity.

**A.IV**

Whether the aggravating factors in this case, to include "the prosecution exhibits" and "the nature of the weapon," were unconstitutionally vague and duplicative. *See Jones v. United States*, 527 U.S. 373 (1999).

**A.V**

Whether the military judge erred by abdicating her responsibility of courthouse security to the government.

**A.VI.**

Assuming *arguendo* that this Court does not overturn *United States v. Dock*, whether Appellant's actions at trial, to include admitting that he was the shooter, amount to a

---

[56] *See* Appellant's Brief at 171-80.

guilty plea prohibited by Article 45, UCMJ. *See also United States v. McFarlane*, 23 C.M.R. 320 (1957).

### A.VII.

Whether the military judge erred to the substantial prejudice of Appellant by denying stan[d]by counsels' motion to submit matters in mi[tig]ation and extenuation.

### A.VIII

The Government failed to offer reasonable, plausible, and non-discriminatory reasons to challenge LTC S., a prospective panel member, pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986).

### A.IX

The cumulative errors in this case compel reversal of the findings and sentence.

## Part B (Systemic Issues)

### B.I

Whether the President exceeded his authority in promulgating aggravating factors in Rule for Courts-Martial (R.C.M.) 1004.

### B.II

Standards applicable to federal and state capital defense counsel have applicability to courts-martial as relevant standards of care, and the Army court's analysis of Major Hasan's case was flawed because of its misapplication of the guidelines and its determination counsel were "well-qualified."

### B.III

Under the Supreme Court's reasoning in *Ring v. Arizona*, 536 U.S. 584 (2002), Congress unconstitutionally delegated to the President the power to enact elements of capital murder, a purely legislative function.

### B.IV

The lack of a system to ensure consistent and even-handed application of the death penalty in the military

violates both Major Hasan's equal protection rights and Article 36, UCMJ. *See* 18 U.S.C. § 2245 and U.S. Dep't of Justice, U.S. Attorney's Manual § 9-10.010 (June 1998) (USAM) and 10 U.S.C. § 949a(b)(2)(C)(ii). In contrast to the USAM, no protocol exists for convening authorities in capital cases, creating an *ad hoc* system of capital sentencing.

### B.V

The military justice system's peremptory challenge procedure, which allows the government to remove any one member without cause, is an unconstitutional violation of the Fifth and Eighth Amendments to the U.S. Constitution in capital cases, where the prosecutor is free to remove a member whose moral bias against the death penalty does not justify a challenge for cause. *But see United States v. Curtis*, 44 M.J. 106, 131-33 (C.A.A.F. 1996); *United States v. Loving*, 41 M.J. 213, 294-95 (C.A.A.F. 1994).

### B.VI

Rule for Courts-Martial (R.C.M.) 1004 does not ensure the goals of individual fairness, reasonable consistency, and absence of error necessary to allow this Court to affirm Appellant's death sentence because R.C.M. 1004 does not ensure the race of the victim or alleged perpetrator is not a factor in the death sentence. *McCleskey v. Kemp*, 481 U.S. 279 (1987).

### B.VII

The variable size of the court-martial panel constituted an unconstitutional condition on Major Hasan's fundamental right to conduct voir dire and promote an impartial panel. *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961).

### B.VIII

The death sentence in this case violates the Fifth, Sixth, and Eighth Amendments and Article 55, UCMJ, because the military system does not guarantee a fixed number of members. *Irvin v. Dowd*, 366 U.S. 717, 722, (1961).

### B.IX

The role of the convening authority in the military justice system denied Major Hasan a fair and impartial trial in violation of the Fifth, Sixth, and Eighth Amendments and Article 55, UCMJ, by allowing the convening authority to act as a grand jury in referring capital criminal cases to trial, personally appointing members of his choice, rating the members, holding the ultimate law enforcement function within his command, rating his legal advisor, and acting as the first level of appeal, thus creating an appearance of impropriety through a perception that he acts as prosecutor, judge, and jury.

### B.X

Article 18, UCMJ, and R.C.M. 201(f)(1)(C), which require trial by members in a capital case, violates the guarantee of due process and a reliable verdict under the Fifth, Sixth, and Eighth Amendments.

### B.XI

Major Hasan was denied his right to a trial by an impartial jury composed of a fair cross-section of the community in violation of the Sixth Amendment to the U.S. Constitution. *Duren v. Missouri*, 439 U.S. 357 (1979). *But see United States v. Curtis*, 44 M.J. 106, 130-33 (C.A.A.F. 1996).

### B.XII

The selection of the panel members by the convening authority in a capital case directly violates Major Hasan's rights under the Fifth, Sixth, and Eighth Amendments to the U.S. Constitution and Article 55, UCMJ, by in effect giving the government unlimited peremptory challenges.

### B.XIII

The President exceeded his Article 36 powers to establish procedures for courts-martial by granting trial counsel a peremptory challenge and thereby the power to nullify the convening authority's Article 25(d) authority to detail members of the court.

**B.XIV**

The designation of the senior member as presiding officer for deliberations denied Major Hasan a fair trial before impartial members in violation of the Fifth, Sixth, and Eighth Amendments to the U.S. Constitution and Article 55, UCMJ.

**B.XV**

Major Hasan was denied his constitutional right under the Fifth Amendment to a grand jury presentment or indictment.

**B.XVI**

Court-martial procedures denied Major Hasan his Article III right to a jury trial. *Solorio v. United States*, 483 U.S. 435, 453-54, (1987) (Marshall, J., dissenting). *But see United States v. Curtis*, 44 M.J. 106, 132 (C.A.A.F. 1996).

**B.XVII**

This Court lacks the jurisdiction and authority to review the constitutionality of the rules for courts-martial and the UCMJ because this Court is an Article I court, not an Article III court with the power to check the legislative and executive branches under *Marbury v. Madison*, 5 U.S. 137, 2 L. Ed. 60, 1 Cranch (1803). *See also Cooper v. Aaron*, 358 U.S. 1 (1958) (the power to strike down unconstitutional statutes or executive orders is exclusive to Article III courts). *But see Loving*, 41 M.J. at 296.

**B.XVIII**

Major Hasan is denied equal protection of law in violation of the Fifth Amendment as all U.S. civilians are afforded the opportunity to have their cases reviewed by an Article III court, but members of the United States military by virtue of their status as service members are not. *But see United States v. Loving*, 41 M.J. 213, 295 (C.A.A.F. 1994).

**B.XIX**

Major Hasan is denied equal protection of law under the Fifth Amendment to the U.S. Constitution because [in accordance with] Army Regulation 15-130, para. 3-1(d)(6), his approved death sentence renders him ineligible for clemency by the Army Clemency and Parole Board, while all other cases reviewed by this Court are eligible for such consideration. *But see United States v. Thomas*, 43 M.J. 550, 607 (N-M. Ct. Crim. App. 1995).

**B.XX**

Major Hasan's death sentence violates the Eighth Amendment prohibition against cruel and unusual punishment because the capital referral system operates in an arbitrary and capricious manner.

**B.XXI**

The death penalty provision of Article 118, UCMJ, is unconstitutional as it relates to traditional common law crimes that occur in the U.S. *But see United States v. Loving*, 41 M.J. 213, 293 (C.A.A.F. 1994). The Court resolved the issue against Private Loving, adopting the reasoning of the decision of the Army Court of Military Review. *See United States v. Loving*, 34 M.J. 956, 967 (A.C.M.R. 1992). However, Private Loving's argument before the Army court relied on the Tenth Amendment and Necessary and Proper Clause of the U.S. Constitution. *Id.* Major Hasan's argument relies on the Eighth Amendment to the U.S. Constitution.

**B.XXII**

The death sentence in this case violates the Fifth and Eighth Amendments to the U.S. Constitution and Article 55, UCMJ, as the convening authority did not demonstrate how the death penalty would enhance good order and discipline.

**B.XXIII**

The military capital sentencing procedure is unconstitutional because military judges do not have the power to adjust or suspend a death sentence improperly imposed.

**B.XXIV**

Due to the military justice system's inherent flaws capital punishment amounts to cruel and unusual punishment under all circumstances.

**B.XXV**

R.C.M. 1001(b)(4) is unconstitutionally vague and overbroad as applied to the appellate and capital sentencing proceedings because it permits the introduction of evidence beyond that of direct family members and those present at the scene in violation of the Fifth and Eighth Amendments.

**B.XXVI**

R.C.M. 1001(b)(4) is unconstitutionally vague and overbroad as applied to the appellate and capital sentencing proceedings because it permits the introduction of circumstances which could not reasonably have been known by Major Hasan at the time of the offense in violation of his Fifth and Eighth Amendment rights.

**B.XXVII**

The military judge erred in admitting victim-impact evidence regarding the personal characteristics of the victims which could not reasonably have been known by Major Hasan at the time of the offense in violation of his Fifth and Eighth Amendment rights.

**B.XXVIII**

The death sentence in this case violates the *Ex Post Facto* Clause, Fifth and Eighth Amendments, separation of powers doctrine, preemption doctrine, and Article 55, UCMJ, because when it was adjudged neither Congress nor the Army specified a means or place of execution.

**B.XXIX**

Whether the panel and the military judge were biased against Appellant.